WANG LABORATORIES,
INC., Plaintiff,

v.

TOSHIBA CORPORATION, et
al., Defendants,

and

Molex Incorporated,
Defendant–Intervenor.

Civ. A. No. 90–1477–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

May 9, 1991.

Thomas B. Newell, Watt, Tieder, Killian & Hoffar, McLean, Va., for plaintiff.

James Joseph Bierbower, Bierbower & Bierbower, Washington, D.C., for defendants.

Howard Leonard Bernstein, Sughrue, Mion, Zinn, Macpeak & Seas, Washington, D.C., for defendant-intervenor.

## MEMORANDUM OPINION

ELLIS, District Judge.

This is an effort to disqualify an expert. It is occasioned by unusual circumstances: Both sides in a patent infringement suit, first plaintiff Wang Laboratories, Inc. ("Wang") and then the NEC defendants ("NEC"),[1] apparently engaged the same expert for the same purpose, namely to furnish an opinion on the validity of the patents in issue. Wang moves to disqualify the expert and for leave to conduct discovery aimed at ascertaining what use, if any, the expert made of Wang's putatively confidential information. For the reasons recorded here, the Court grants the disqualification motion, but denies the discovery request.

### Facts

Most of the essential facts are uncontroverted. Instead, the parties' disputes focus

---

**1.** The "NEC defendants" include Nippon Electric Company, Ltd., NEC America, Inc., NEC Technologies, Inc. and NEC Electronics, Inc. Also named as defendants in this patent infringement suit are Toshiba Corporation, Toshi-ba America, Inc., Toshiba America Electronic Components, Inc. and Toshiba America Information Systems, Inc.· Completing the list of defendants is Molex, Inc., which was permitted to intervene as a defendant.

chiefly on the inferences to be drawn from those facts and their legal significance.

The scenario begins in November 1990 when Thomas Scott, counsel for Wang, telephoned John Balde, a computer consultant,[2] with the intention of retaining Balde to serve as a Wang consultant in this case. The parties agree that the call confirmed that Balde was familiar with single in line memory module ("SIMM") technology, the subject of the patents in suit. According to Scott, the telephone call also resulted in Wang's retention of Balde and an agreement by Scott to pay Balde for his time. Balde's impression of this telephone conversation is different. He claims no retention occurred because he told Scott he first had to determine the validity of the patents before he would be interested in any arrangement with Wang.

Following the November 14 telephone conversation, Scott sent Balde a letter bearing that date and enclosing various materials he had selected or created. Specifically, the letter enclosed the patents in issue, certain prior art publications, some materials pertinent to the infringement issue, and a lengthy, detailed memorandum Scott prepared concerning the patents' prosecution history. In this letter, Scott asked Balde to review the material "so that we can discuss how best to explain the advantages to a computer designer of using Wang's SIMM memory technology." Scott closed the letter by noting that he wanted to meet with Balde once the latter had reviewed the enclosed material.

The next day Scott sent another letter. This letter, unlike the earlier one, was prominently labeled "CONFIDENTIAL ATTORNEY—WORK PRODUCT." It contained an outline of the potential defenses to Wang's suit as Scott then viewed them. It also focused more sharply the topics on which Wang needed Balde's views. In closing, Scott wrote that "this outline will assist your review of the materials included in my November 14, 1990 letter." Scott avers that he subsequently had several conversations with Balde concerning the technical aspects of the case, conversations in which he claims to have disclosed confidential information and in which he contends he made clear to Balde that the conversations were confidential. Balde does not specifically deny that the further telephone calls took place. He claims, however, that he made no use of the November 15th letter. In his view, the letter was premature; it sought his opinions on specific litigation issues, yet Balde's position, in his own mind, was that he would not agree to be retained until he first determined that the patents were valid. Balde wrote no letter to Scott expressing this view.

In any event, Balde proceeded to investigate the patents in suit, ostensibly by his own means, including consultations with, as he put it, "a few qualified people." Then, on December 10, 1990, Balde called Scott to report his conclusion that the patents were invalid and that he, Balde, was therefore not interested in pursuing the matter as a consultant. Scott requested a report, which Balde sent two days later. Balde's cover letter for the report opened by noting that "[a]s you know, I [Balde] have read the patents and the Work–Product information on the two Wang SIMM patents...." He closed by thanking Scott for offering to pay his $1,540 invoice for time spent on the task and by noting that he hoped he might be "of more useful service to you for some other issues that might arise." The report itself is detailed and covers three-and-one-half single-spaced typed pages.

Sometime thereafter, NEC contacted and retained Balde. Neither Scott nor anyone on Wang's behalf was advised of this until April 1991, when NEC's counsel advised Wang's counsel that Balde would be called to testify at trial as an NEC expert on the patent validity issues. Wang's disqualification motion followed.

2. Mr. Balde is Senior Consultant with Interconnection Decision Consulting Corp., a firm he founded in 1981.

**1248**

*Analysis*

■ Circumstances similar to those at bar are not common. Not surprisingly, therefore, the parties have cited no controlling authority directly on point. *See Paul v. Rawlings Sporting Goods Co.,* 123 F.R.D. 271, 277 (S.D.Ohio 1988) ("There appears to be little case law dealing with the issue of disqualification of expert witnesses"). Even so, existing analogous authority points persuasively to the conclusion that disqualification is required in the circumstances at bar.

Analysis properly begins with an acknowledgment of the inherent power of federal courts to disqualify experts in certain circumstances. This power exists in furtherance of the judicial duty to protect the integrity of the adversary process and to promote public confidence in the fairness and integrity of the legal process. *See Paul,* 123 F.R.D. at 277–78; *Great Lakes Dredge & Dock Co. v. Harnischfeger Corp.,* 734 F.Supp. 334, 336 (N.D.Ill.1990).

■ While the existence of the disqualification power is clear, its exercise presents more difficult issues in certain circumstances. To be sure, no one would seriously contend that a court should permit a consultant to serve as one party's expert where it is undisputed that the consultant was previously retained as an expert by the adverse party in the same litigation and had received confidential information from the adverse party pursuant to the earlier retention. This is a clear case for disqualification. *See Marvin Lumber & Cedar Co. v. Norton Co.,* 113 F.R.D. 588 (D.Minn. 1986); *Miles v. Farrell,* 549 F.Supp. 82 (N.D.Ill.1982). Less clear are those cases where, as here, the parties dispute whether the earlier retention and passage of confidential information occurred. In this event, courts should undertake a two-step inquiry:

First, was it objectively reasonable for the first party who claims to have retained the consultant, in this case Scott

on behalf of Wang, to conclude that a confidential relationship existed?

Second, was any confidential or privileged information disclosed by the first party to the consultant?

*See Paul,* 123 F.R.D. at 278; *Great Lakes Dredge & Dock Co.,* 734 F.Supp. at 337.

Affirmative answers to both inquiries compel disqualification. But disqualification is likely inappropriate if either inquiry yields a negative response. Thus, even if counsel reasonably assumed the existence of a confidential relationship, disqualification does not seem warranted where no privileged or confidential information passed. *See Paul,* 123 F.R.D. at 279 (expert not disqualified where there was a "lack of communication of any information of either particular significance or which can be readily identified as either attorney work product or within the scope of the attorney client privilege"); *see also Nikkal Ind. Ltd. v. Salton, Inc.,* 689 F.Supp. 187, 190 (S.D.N.Y.1988). Were this not so, lawyers could then disable potentially troublesome experts merely by retaining them, without intending to use them as consultants. Lawyers using this ploy are not seeking expert help with their case; instead, they are attempting only to prevent opposing lawyers from obtaining an expert. This is not a legitimate use of experts, and courts should not countenance it by employing the disqualification sanction in aid of it.

Similarly, disqualification should not occur in the absence of a confidential relationship even though some confidential information may be disclosed. *See Estate of George S. Halas, Sr. v. Commissioner,* 94 T.C. 570, 577 (1990) (expert not disqualified where no previous confidential relationship existed between an appraiser and the taxpayer). In this event, the disclosure is essentially a waiver of any existing privilege.[3] Lawyers bear a burden to make clear to consultants that retention and a confidential relationship are desired and intended. Fairness requires this. Fairness

---

3. But in more ambiguous circumstances, the disclosure of confidential information may serve to support the inference that the lawyer was objectively reasonable in assuming the existence of a confidential relationship.

also requires that consultants with doubts about their desire to be retained should express these doubts clearly and unequivocally to the inquiring lawyer and decline to accept any disclosures unless and until the doubts are resolved. In sum, the two-step inquiry employed here adequately protects confidentiality within the lawyer-consultant relationship while, at the same time, it effectively prevents lawyers from engaging in the impermissible practice of retaining consultants merely to preclude opposing counsel from doing so.

Applied to the facts of this case, the two-step inquiry yields affirmative responses to both questions. It is indisputable that Scott disclosed confidential work product material to Balde. Scott's memorandum detailing and assessing the patent file wrapper history and his November 15 letter outlining potential defenses to Wang's suit are the clearest examples. While the value of the disclosures is debatable, their essential work-product nature is not. No experienced litigator would freely disclose these materials to opposing counsel. Beyond this, the totality of circumstances points convincingly to the conclusion that Scott was reasonable in assuming the existence of a confidential relationship with Balde. Thus, the November 14 and 15 letters, though neither is entirely free from ambiguity, are both plainly consistent with

Scott's sworn assertion that he considered he had retained Balde and that a confidential relationship existed. The amount and nature of the materials included with the letters furnish additional support for this conclusion. The letters informed Balde of the case issues and identities of the parties involved. Significantly, the November 15 letter was prominently labeled as confidential. Balde's silence in the face of receiving this information reenforces the reasonableness of Scott's assumption that a confidential relationship existed. Under these circumstances, Scott was objectively reasonable in assuming that he had retained Mr. Balde and that a confidential relationship existed.

The result reached here is consistent with the authorities cited by the parties. Thus, courts have disqualified consultants where there was persuasive evidence that a lawyer was objectively reasonable in assuming the existence of a confidential relationship and that confidential information was disclosed.[4] By the same token, courts have allowed experts to testify where these elements are absent.[5]

Finally, it is worth noting that nothing in this opinion or the Court's ruling is intended to suggest that either party or the consultant acted inappropriately.[6] But it may

---

**4.** See *Marvin Lumber & Cedar Co.,* 113 F.R.D. at 591–92 (independent laboratory retained by defendant was disqualified because it had previously been employed by plaintiff in matters "substantially related" to the litigation); *Conforti & Eisele, Inc. v. New Jersey,* 170 N.J.Super. 64, 405 A.2d 487 (1979) (injunction granted to prevent engineering firm from serving as contractor's consultant where it had previously served as the state attorney's consultant on earlier phases of the litigation and it was reasonable to assume that consultant was aware of state attorney's views on the other stages); *Miles,* 549 F.Supp. 82 (N.D.Ill.1982) (physician could not testify as defendant's expert where he had treated plaintiff before and after being retained by defendant and did not reveal this to plaintiff); *see also Wang Laboratories, Inc. v. CFR Assoc., Inc.,* 125 F.R.D. 10 (D.Mass.1989) (protective order granted in patent infringement suit to prohibit defendant from using plaintiff's former employee as expert in light of employee's confidentiality agreement with plaintiff).

**5.** See *Great Lakes,* 734 F.Supp. at 338 (court refused to disqualify an expert where "neither

party has retained an expert that has worked or been associated with the opposing side"); *Estate of George S. Halas,* 94 T.C. at 577 (court refused to disqualify respondent's expert appraiser where appraiser "had no prior relationship, confidential or otherwise" with petitioners; "none of petitioners [were] former or current clients" of the expert); *Nikkal,* 689 F.Supp. at 190 (court refused to disqualify expert where party's meeting "amounted to no more than a comprehensive employment interview" and party "never in fact utilized [expert's] services"); *Paul,* 123 F.R.D. at 277–81 (expert not disqualified where there was some doubt that counsel could reasonably assume that a confidential relationship existed and where the exchanges between the expert and counsel did not involve the subject matter of the suit).

**6.** Were there evidence of misconduct or abuse of the process a different result might obtain. Similarly, a different result might be warranted if, as is not true here, the consultant involved were unique in some relevant sense.

also be worth noting that steps can be taken to avoid a repetition of these unfortunate circumstances. First, a lawyer seeking to retain an expert and establish a confidential relationship should make this intention unmistakably clear and should confirm it in writing. It is helpful to include in the writing an explanation of the consultant's confidentiality obligation as well as a confirmation of the payment terms and conditions. Work–Product communications to the consultant should be prominently labeled as such. Just as lawyers must avoid ambiguity in the retention process, so too must consultants take care to avoid conduct that contributes to a lack of clarity about the relationship. If a consultant has doubts that she or he wants to be retained, those doubts should be unequivocally expressed. Such consultants should decline to accept any disclosures. In this instance, the consultant, given his stated concerns, needed no more information than the identity of the parties and the patent numbers. Armed with just this information, the consultant could have resolved his doubts about the retention and declined the offer without disclosing his opinion on the ultimate patent validity issue. Also, given the fact that Balde had served NEC as a consultant on at least one prior occasion, he might have anticipated an NEC request to serve as its consultant in this case. Counsel seeking to retain a consultant should inquire specifically whether consultant's past employment presents any problems. As for counsel in the position of NEC's counsel, she or he should take care to ascertain all the facts concerning the prior retention or attempted retention and the nature of all disclosures. In most circumstances, if the second retention is effected, the fact should be promptly disclosed to opposing counsel and the matter discussed thoroughly in an effort to resolve the dispute before it is raised in court.

Experts, strictly speaking, are not advocates; they are sources of information and opinions in technical, scientific, medical or other fields of knowledge. Yet when experts are retained in connection with litigation, they must operate within the con-straints of, and consistent with, the adversary process. This dispute was a reminder of this essential fact.

An appropriate Order has issued.