In re:  Linda J. MITCHELL,
Plaintiff–Respondent,

v.

Robert WILMORE and Tramp Master,
Inc., Defendants–Petitioners.

No. 99SA14.

Supreme Court of Colorado,
En Banc.

June 1, 1999.

DiGiacomo & Jaggers, LLP Douglas J. Perko, Arvada, Colorado, Attorneys for Plaintiff–Respondent.

Rodman & Ross–Shannon John R. Rodman David L. Murphy, Denver, Colorado, Attorneys for Defendants–Petitioners.

Justice MARTINEZ delivered the Opinion of the Court.

In this personal injury lawsuit, the plaintiff retained and endorsed an expert witness who was previously retained and utilized as a pre-trial consultant by the opposing party.

Fearing that their former consultant will be in a position to utilize confidential information to their detriment at trial, Petitioners/Defendants Robert Wilmore and Tramp Master, Inc. (collectively "Wilmore"), have sought relief in the nature of mandamus pursuant to article VI, section 3 of the Colorado Constitution and C.A.R. 21. Wilmore asserts that the trial court erroneously refused to disqualify the expert from further participation on behalf of the opposing party, Respondent/Plaintiff Linda Mitchell. We issued a rule to show cause, and now conclude that disqualification should have been ordered. Accordingly, we make the rule absolute.

I.

The personal injury action arises out of a rear-end automobile accident. At issue in the dispute below is whether the relatively low-speed accident could have caused the injuries being claimed by Mitchell.

During the course of pre-trial preparations, Wilmore contacted the firm of Biomechanics Research & Consulting, Inc., ("BRC"), for input on the causation issues raised by the case.[1] BRC president Jeffrey Wheeler accepted the matter on behalf of BRC, and together with biomechanist John Brault, performed a work-up and preliminary analysis of the accident. During a July 15, 1998 telephone conference, Wheeler and Brault discussed the case with counsel for Wilmore. The content and nature of this call is addressed in more detail below. BRC was paid for its services, and its work on the case put on hold. Although Wilmore continued to retain the BRC firm on a consulting basis, the consultants were not designated as expert witnesses for trial.

One month later, Mitchell also took steps to employ the BRC firm. Like Wilmore, Mitchell was interested in a biomechanical work-up of the forces involved in the accident. BRC's system of cross-checking files failed to detect the potential conflict of interest, and neither Wheeler nor Brault recog-

1. The record indicates that the field of biomechanics involves the analysis of physical forces acting upon or through biological systems, and as relevant here, the study of the effects or potential effects of such forces in automobile and other accidents.

nized the Mitchell representation as duplicative of the earlier work they had personally performed on behalf of Wilmore. As a result, the BRC firm — and Mr. Brault, in particular — became involved on both sides of the litigation. This dual retention occurred without the knowledge of either counsel, and the BRC experts have professed that the situation did not arise out of an intentional act or deliberate oversight on their part.

When Mitchell designated Brault as an expert witness for the upcoming trial, Wilmore objected, pointing to the conflict of interest created by the dual retention. Following Mitchell's refusal to voluntarily withdraw the Brault designation, Wilmore filed a motion requesting that the designation be stricken. The motion was based on the court of appeals' decision in *City of Westminster v. MOA, Inc.*, 867 P.2d 137 (Colo. App.1993), which described a two-part test evaluating (1) whether a prior confidential relationship had been established, and (2) whether confidential information was shared with the expert during the relationship. Wilmore argued that the requisite confidential relationship with BRC had been established, and that confidential information in the form of trial strategy, approaches to discovery, and other mental impressions of counsel had been discussed with Wheeler and Brault during the July 15, 1998 phone conference.

Alternatively, Wilmore claimed that the *MOA* opinion could be read to allow disqualification even absent the passing of confidential information. In essence, the argument was that the situation created by BRC's dual role in the case had such an inherent appearance of impropriety that the BRC experts should be expunged in order to preserve the public's confidence in the judicial system.

Mitchell conceded the existence of a prior confidential relationship, but insisted that Wilmore had not met the second requirement for disqualification. In support of this point, Mitchell attached a joint sworn affidavit by the BRC experts in which Wheeler stated that he "[did] not believe" that counsel for the Wilmore defendants had disclosed confidential information, and Brault stated that he "[did] not recall" whether any such disclo-

sures were made during the July 15, 1998 phone conference.

The trial court held a hearing to consider whether confidential information had been shared with the BRC experts. Counsel for Wilmore swore out two affidavits and tendered them at the hearing. The first affidavit was intended for open court, and provided only a generic description of matters discussed during the phone conference of July 15, 1998:

> During the conversation, we discussed their opinions and analyses of the biomechanical aspects of this case. At that time, I shared with them certain mental impressions and thought processes of the case. I also discussed with them strategies for proceeding with the case. At that time, the plaintiff's deposition had not yet been completed. Among the strategies discussed with Messrs. Wheeler and Brault were the approaches and issues to be covered with the plaintiff at the time of her deposition.

The second affidavit was for "in camera review only," and was sealed by the trial court. In this affidavit, counsel for Wilmore explained the matters discussed during the July 15, 1998 phone conference in more detail. The affidavit reiterated the claim that confidential mental impressions regarding the case were passed, and gave several examples of the particular topics that counsel recalled discussing with the BRC experts.

The trial court conducted an in camera review of the sealed affidavit, and it accepted that the content of the July 15, 1998 phone conference was accurately reflected, finding "that this is what [counsel for Wilmore] discussed with the experts." However, the court stated that it did not "believe this information [was] the kind of confidential or privileged information contemplated in the case law." Accordingly, the court refused to strike the Brault designation.

Wilmore now asks this court for relief, arguing that the trial court's ruling will irreversibly prejudice the litigation of this case on the merits.

## II.

■ This court's original jurisdiction may be exercised when a pre-trial ruling will place a party at a "significant disadvantage in litigating the merits of the controversy," and conventional appellate remedies would prove inadequate. *See Margolis v. District Court,* 638 P.2d 297, 300 (Colo.1981); *Sanchez v. District Court,* 624 P.2d 1314, 1316 (Colo.1981). Both considerations are present here. If the trial court's ruling is allowed to stand, ordinary appellate remedies could not properly address any prejudice that might result from Brault's testimony because there could be no way to prevent Mitchell from relying upon any improperly revealed confidences during a subsequent retrial. We therefore conclude that the exercise of original jurisdiction pursuant to article VI, section 3 of the Colorado Constitution and C.A.R. 21 is appropriate here.

## III.

Wilmore argues that, although the trial court accepted that the subject matter described in the in camera affidavit had been discussed with the BRC experts, it failed to recognize that this was the type of confidential information that requires disqualification. Specifically, Wilmore contends that the discussions between counsel and the BRC experts revealed the type of mental impressions and strategic preparations protected by the work-product doctrine. We agree. Because we conclude that Brault must be disqualified due to the information he received during the July 15, 1998 phone conference, we need not address whether any of the other disclosures by Wilmore were similarly disabling.

## A.

■ As the court of appeals' decision in *MOA* recognized, conflicts of interest involving non-attorney experts should be analyzed under a two-part test evaluating both the nature of the earlier relationship and the type of information shared during the retention. *See MOA,* 867 P.2d at 139. This approach was first articulated in *Wang Laboratories, Inc. v. Toshiba Corp.,* 762 F.Supp. 1246, 1248 (E.D.Va.1991), and is the rule in the majority of jurisdictions that have considered this issue. The test involves two questions:

> First, was it objectively reasonable for the first party who claims to have retained the consultant ... to conclude that a confidential relationship existed?
>
> Second, was any confidential or privileged information disclosed by the first party to the consultant?

*Id.*

■ Under this framework, "[a]ffirmative answers to both inquiries compel disqualification," but "disqualification is likely inappropriate if either inquiry yields a negative response." *Id.* Further, the party seeking disqualification has the burden of proving both the grounds for disqualification, and the non-waiver of any confidentiality being asserted. *See English Feedlot, Inc. v. Norden Lab., Inc.,* 833 F.Supp. 1498, 1501–02 (D.Colo.1993).

■ Wilmore's alternative argument at the hearing below embraced the view that disqualification might be appropriate even absent a showing that confidential information was passed during the prior retention. This position was based on language from *MOA* suggesting that "[e]ven if no disclosures occur," disqualification might be required to "protect the integrity of the judicial process." *See MOA,* 867 P.2d at 140. However, expert disqualification absent strict satisfaction of the two-part test is actually the minority rule, and is fashioned after the rigid standards governing conflicts of interest involving attorneys. *See Marvin Lumber & Cedar Co. v. Norton Co.,* 113 F.R.D. 588, 591 (D.Minn.1986); *Conforti & Eisele, Inc. v. Division of Bldg. & Const.,* 170 N.J.Super. 64, 405 A.2d 487, 490 (Law Div. 1979). We do not agree with such an approach, and it is inconsistent with the two-part test properly announced earlier in the *MOA* decision. We therefore disapprove of *MOA* to the extent it can be read to embrace the minority view. We recognize, instead, that experts and attorneys perform different roles in litigation, and that these roles rightly justify differing standards. See *United States ex rel. Cherry Hill Convalescent Ctr., Inc. v. Healthcare*

*Rehab Sys., Inc.*, 994 F.Supp. 244, 249 (D.N.J.1997) ("[e]xperts act as sources of information and opinions in order to assist parties and triers of facts to understand evidence," while "[a]ttorneys act as advocates of their client's positions and, thus, owe a higher level of fiduciary duty to the client than do the experts"). Thus, while Mitchell has conceded the existence of an objectively reasonable confidential relationship between Wilmore and the BRC experts, disqualification is not appropriate unless the passing of confidential information is also shown.

▮▮ In this context, "confidential information" includes disclosures containing information in the nature of attorney work-product or privileged attorney-client communication. In *Wang*, for example, the court found disqualification to be appropriate in light of the fact that the expert had been exposed to both an assessment of a disputed patent, and counsel's views regarding potential defenses in the suit. 762 F.Supp. at 1249. Similarly, where an expert was told counsel's "theory of the case" and had access to the mental impressions of counsel as manifested in the "grouping of the photographs and documents," the second prong of the disqualification test was found to be satisfied. *Cordy v. Sherwin-Williams Co.*, 156 F.R.D. 575, 581 (D.N.J. 1994) A particularly clear case for disqualification can be made when an expert is privy to explicit discussions of strategy related to the pending litigation. *See MMR/Wallace Power & Indus., Inc. v. Thames Assoc.*, 764 F.Supp. 712, 725 (D.Conn.1991) (expert had "assisted counsel in preparing for depositions and in answering interrogatories," and attended meetings "in which confidential litigation strategies were discussed"); *A&A Electrical Contractors, Inc. v. C.H. Nickerson & Co.*, No. CV89 0369686S, 1993 WL 524996 at *2 (Conn.Super.Ct.1993) (consultant was privy to discussions of case strategy.)

▮▮ By way of contrast, however, the discussion of mere technical information about a case does not meet a party's burden under this framework. *See, e.g., Nikkal Industries v. Salton, Inc.*, 689 F.Supp. 187, 191–92 (S.D.N.Y.1988) (meeting with consultant constituted "employment style interview," and dealt with information "essentially technical" in nature). Nor is disqualification appropriate where the confidentiality of the information has been legally waived, *see English Feedlot*, 833 F.Supp. at 1504, or if the information claimed to be confidential is actually routinely discoverable. *See Palmer v. Ozbek*, 144 F.R.D. 66, 68 (D.Md.1992).

### B.

▮▮ In light of these principles, we turn now to the facts of this case. We have reviewed the "in camera" affidavit considered by the trial court.[2] In our view, the discussions related therein include the mental impressions and thought processes of counsel, as well as strategies pertaining to discovery and trial — all matters in the nature of attorney work-product. *See People v. Martinez*, 970 P.2d 469, 475 (Colo.1998) (work-product doctrine "is designed to protect an attorney's mental processes reflected in 'interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and intangible ... materials.'") (quoting *Hickman v. Taylor*, 329 U.S. 495, 511, 67 S.Ct. 385, 91 L.Ed. 451 (1947)).[3]

Wilmore obtained the services of the BRC consultants for the initial purpose of establishing whether the low-speed accident in question could be conclusively excluded as a cause of the plaintiff's injuries. Even if the BRC experts were of the view that the acci-

---

**2.** Although we have reviewed the sealed affidavit, we are unable to offer much about its contents because it remains under seal.

**3.** While the work-product doctrine is most frequently encountered in the context of discovery requests regarding tangible materials prepared in anticipation of litigation, it is the inclusion of an attorney's mental processes and case strategies that invoke the applicable protections. *See*

*Watson v. RTD*, 762 P.2d 133, 142 (Colo.1988) (material that could not be "characterized as reflecting the mental processes of ... counsel" was discoverable); *see also Martinez*, 970 P.2d at 475 (witness statements, though compiled by attorney, were not undiscoverable work-product, in part, because they did not contain "the attorney's mental impressions and strategies").

dent could not be fully excluded, the consulting relationship remained important – as did Wilmore's objectively reasonable belief that their relationship with BRC was a confidential one and that the matters discussed would remain inviolate.

By reviewing the biomechanical possibilities and engaging in further dialog as to what information might be useful if obtained in discovery, counsel for Wilmore and the BRC consultants acted in a manner consistent with the proper preparation of the case. Moreover, through their participation in this exchange, the BRC consultants learned of and contributed to the strategies and mental impressions of counsel.

Given the absence of any evidence that Wilmore waived these confidences, we believe that disqualification was compelled. As stated in *Wang,* "While the value of the disclosures is debatable, their essential work-product nature is not. No experienced litigator would freely disclose these materials to opposing counsel." *Wang,* 762 F.Supp. at 1249. The discussions that took place during the July 15, 1998 phone conference could very well have impacted Brault's subsequent participation on behalf of Mitchell, and it is difficult to say with confidence that Brault would have produced the same report and drawn the same conclusions if he had never spoken to counsel for Wilmore. *Cf. Paul v. Rawlings Sporting Goods Co.,* 123 F.R.D. 271, 280 (S.D.Ohio 1988) (expert not disqualified where prior exchanges did not involve the subject matter of the suit and could not have impacted expert's approach). Once a court concludes that confidential information has been disclosed, it is this difficulty in determining conclusively what impact such information might have on the expert's analysis or subsequent testimony that justifies the invocation of the rule. Accordingly, the trial court erred when it concluded that the disclosures did not represent the kind of confidential information contemplated by the standards governing expert disqualification.

## IV.

In sum, we hold that where a party (1) is objectively reasonable in concluding that a confidential relationship has been established with an expert consultant; and (2) shares confidential information during the course of said relationship, the consultant may not be subsequently utilized as an expert witness by the opposing party. We further hold that the trial court failed to recognize that the discussions described in the sealed affidavit included confidential information in the form of counsel's strategies and mental impressions, and as a result, erroneously concluded that the second prong of the test for disqualification had not been established.

Accordingly, we make our rule absolute and direct the trial court to order the witness disqualified.