William R. RHODES, et al., Plaintiffs,

v.

**E.I. DU PONT DE NEMOURS AND COMPANY, Defendant.**

**Civil Action No. 6:06–cv–00530.**

United States District Court, S.D. West Virginia.

June 10, 2008.

---

Named expert: Dr. Elizabeth L. Anderson

Gerald R. Rapien, Robert A. Bilott, Taft Stettinius & Hollister, Cincinnati, OH, Harry G. Deitzler, R. Edison Hill, Hill Peterson Carper Bee & Deitzler, Larry A. Winter, Winter, Johnson & Hill, Charleston, WV, J. Steven Justice, Taft Stettinius & Hollister, Dayton, OH, for Plaintiffs.

Anthony F. Cavanaugh, Douglas G. Green, Jennifer Quinn–Barabanov, Libretta P. Stennes, Mark P. Fitzsimmons, Steptoe & Johnson, Washington, DC, Laurence F. Janssen, Steptoe & Johnson, Los Angeles, CA, Nathan B. Atkinson, Spilman Thomas & Battle, Winston–Salem, NC, Niall A. Paul, Robert J. O'Neil, Stephanie L. Ojeda, Spilman Thomas & Battle, Charleston, WV, for Defendant.

## MEMORANDUM OPINION AND ORDER

JOSEPH R. GOODWIN, Chief Judge.

Pending before the court is the plaintiffs' Motion to Disqualify Dr. Elizabeth L. Anderson as an expert witness for the defendant [Docket 170]. For reasons set forth below, the plaintiffs' motion is **GRANTED**.

### I. Background

Without the work of scientists, whose ranks include those working in universities, governmental agencies, and corporations, our country would not be the leader in science and technology that it is today. Our health and progress depend on scientific inquiry, and those devoted to the sciences should be commended for their contribution. Litigants, courts, and juries have certainly benefitted greatly by the guidance and direction provided by expert testimony. Although frequently helpful, it is undeniable that "expert witnessing" is a burgeoning business which is often more lucrative than the usual day job for many experts. *See* Kendall Coffey, *Inherent Judicial Authority and the Expert Disqualification Doctrine*, 56 Fla. L.Rev. 195, 196 (2004). The increased use and importance of experts in litigation has raised numerous questions regarding conflicts of interest. *Id.* These issues validate the century-old observation of Judge Learned Hand: "[n]o one will deny that the law should in some way effectively use expert knowledge wherever it will aid in settling disputes. The only question is as to how it can do so best." Learned Hand, *Historical and Practical Considerations Regarding Expert Testimony*, 15 Harv. L.Rev. 40, 40 (1901–1902).

This case arises from the defendant's alleged release of perfluoroctanoic acid ("PFOA" or "C–8") from its Washington Works plant in Wood County, West Virginia. (Am. Class Action Compl. ¶ 1 [Docket 6].) The plaintiffs allege that C–8 from the defendant's plant has contaminated the drinking water of the communities near the plant, including the city of Parkersburg. (Id. ¶¶ 7–8.) In this motion, the plaintiffs argue that Dr. Elizabeth L. Anderson, a class certification expert for the defendant, should be disqualified because of a conflict of interest arising from her consulting relationship with the plaintiffs' counsel in a prior related state action brought in the Circuit Court of Wood County, West Virginia, *Leach v. E.I. du Pont de Nemours & Co.*, No. 01–C–608. (Mem. Supp. Pls.' Mot. Disqualify 2 [Docket 169].) In the current litigation, Dr. Anderson will opine on behalf of the defendant that the plaintiffs have improperly used regulatory risk assessment principles in order to draw inferences of class-wide risk for serious latent diseases. (Def.'s Resp. Opp'n Pls.' Mot. Disqualify 2 [Docket 178].) The plaintiffs argue that Dr. Anderson should be disqualified because her testimony in this case will address the same topics and issues for which the plaintiffs' counsel had retained her in *Leach*. (Mem. Supp. Pls.' Mot. Disqualify 1.)

In *Leach*, counsel for the plaintiffs (the "Firms") represented a class of persons from communities where water was allegedly contaminated by C–8 in a suit against the same defendant. The plaintiffs in the instant case were initially among the plaintiffs in *Leach*, but were left out of the class when the parties agreed to define the class requirement of "contaminated water" as having C–8 at the minimum level of 0.05 parts per billion. (Order Den. DuPont's Mot. Disqualification Judge Hill at 4, Pls.' Mem. Class Certification, Ex. 7 [Docket 188].) Because testing of the Parkersburg water supply at that time produced figures that did not meet the threshold level and/or were non-quantifiable, the Parkersburg plaintiffs were excluded from the class. (*See* Table 4.1 at 25, Def.'s Mem. Opp'n Class Certification, Ex. B.19 [Docket 193].) More recent tests have found that Parkersburg water contains C–8 levels surpassing 0.05 parts per billion. (Am. Compl. ¶ 42.)

The Firms retained Dr. Anderson in 2001 to provide expert services for the *Leach* plaintiffs in connection with that litigation. (Retention Letter, Mem. Supp. Pls.' Mot. Disqualify, Ex. A.) According to the plaintiffs, "[t]he *Leach* plaintiffs asked Dr. Anderson to provide confidential, expert toxicology and risk assessment consulting services in connection with assessing the safety of C–8 in human drinking water supplies." (Mem. Supp. Pls. Mot. Disqualify 2 (citing Robert A. Bilott Aff. ¶ 3).) The plaintiffs allege that after being retained, Dr. Anderson "received confidential information of the *Leach* plaintiffs" in the form of "documents provided by the Firms" and "telephone conversations during which highly confidential issues of case strategy and expert testimony in support of that strategy were discussed." (*Id.*) In her declaration, Dr. Anderson disputes the plaintiffs' allegations, stating that she agreed to perform only a preliminary review of some toxicological literature regarding C–8. (Decl. of Elizabeth L. Anderson ¶ 6, Def.'s Resp. Opp'n Pls.' Mot. Disqualify, Ex. 1.) After reviewing the literature, Dr. Anderson states that she informed Robert Bilott, counsel for the *Leach* plaintiffs, that she would not testify on behalf of the *Leach* plaintiffs. (*Id.* ¶ 9.) Dr. Anderson also refutes Mr. Bilott's claim that she received any confidential information, and asserts that she did not review any confidential documents or dis-

cuss strategies or strategic issues with the Firms. (*Id.* ¶ 7.)

## II. Legal Standard

 A federal court has the inherent power to disqualify experts. *Grant Thornton, LLP v. FDIC*, 297 F.Supp.2d 880, 882 (S.D.W.Va.2004) (citing *Koch Refining Co. v. Boudreaux M/V*, 85 F.3d 1178, 1181 (5th Cir.1996)). Cases granting disqualification are rare because courts are "generally reluctant to disqualify expert witnesses, especially those ... who possess useful specialized knowledge." *Id.* (quoting *Palmer v. Ozbek*, 144 F.R.D. 66, 67 (D.Md.1992)). Accordingly, the party seeking disqualification "bears a 'high standard of proof' to show that disqualification is warranted." *Id.* (quoting *Tessier v. Plastic Surgery Specialists, Inc.*, 731 F.Supp. 724, 729 (E.D.Va.1990)).

Numerous courts cite to *Wang Laboratories, Inc. v. Toshiba Corp.*, 762 F.Supp. 1246 (E.D.Va.1991), in assessing whether an expert should be disqualified. *See, e.g., Koch Refining*, 85 F.3d at 1181; *Hewlett-Packard Co. v. EMC Corp.*, 330 F.Supp.2d 1087, 1093 (N.D.Cal.2004); *Grant Thornton*, 297 F.Supp.2d at 883 n. 2; *U.S. ex rel. Cherry Hill Convalescent Center, Inc. v. Healthcare Rehab Sys., Inc.*, 994 F.Supp. 244, 249 (D.N.J.1997); *Theriot v. Parish of Jefferson*, Civ. A. No. 95–2453, 1996 WL 392149, *2 (E.D.La. Jul. 8, 1996); *Cordy v. Sherwin–Williams Co.*, 156 F.R.D. 575, 580 (D.N.J.1994). Some courts interpret *Wang Laboratories* to require a bright-line

rule because the court stated that in cases in which "it is undisputed that the consultant was previously retained as an expert by the adverse party in the same litigation and had received confidential information from the adverse party pursuant to the earlier retention," disqualification is "clear." *Wang Labs.*, 762 F.Supp. at 1248. The case goes on to say, however, that when side-switching by an expert is not so clear, cases require the application of a two-part test:[1] "First, was it objectively reasonable for the first party who claims to have retained the [expert] ... to conclude that a confidential relationship existed? Second, was any confidential or privileged information disclosed by the first party to the [expert]?" *Id.*; *see also Koch Refining*, 85 F.3d at 1181.

### A. The Bright-line Rule

On its face, *Wang Laboratories* is unclear whether its approach to expert disqualification constitutes two distinct tests (the bright-line rule and the two-part test), or one test within which the bright-line rule is the extreme. Though *Wang Laboratories* stated that disqualification is "clear" when there is no dispute about the expert's previous retention and the expert's receipt of confidential information from the adverse party, that declaration was not necessary to the outcome of the case. Nevertheless, other federal courts have cited the rule as though it is binding. *See, e.g., Koch Refining*, 85 F.3d at 1181

---

1. In *Grant Thornton, LLP v. FDIC*, 297 F.Supp.2d 880 (S.D.W.Va.2004), Judge Faber cited the defendant's brief for an alternative, but related, three-part test: "the expert has (1) had some prior relationship with the moving party, (2) as a result of which the expert received confidential information, (3) about the case at issue that has affected or will affect the expert's opinions." *Id.* at 883. Judge Faber then set forth in a footnote the two-part test from *Wang Laboratories* and

concluded that under either test, the expert in question was not subject to disqualification. Other federal courts widely use the *Wang Laboratories* two-part test, and, as a result, it is more developed and has been applied to a wider variety of situations. It is also essentially the same in application as the test set forward by Judge Faber. I adopt the *Wang Laboratories* two-part test rather than the three-prong counterpart from *Grant Thornton* as the alternative to the bright-line rule.

(rejecting at the outset the proposition that the case could be disposed of under the bright-line rule from *Wang Laboratories*); *Howmedica Osteonics Corp. v. Zimmer, Inc.*, Civ. A. No. 05–0897, 2007 WL 4440173, *3 (D.N.J. Dec. 17, 2007) (finding disqualification required under the bright-line approach from *Wang Laboratories*); *Theriot*, 1996 WL 392149, at *2 (finding that the case before the court was so related to a prior case that it triggered the bright-line disqualification rule from *Wang Laboratories*).

Despite courts' recognition of the bright-line rule, the cases that preceded *Wang Laboratories*, and on which the *Wang Laboratories* court relied in declaring the rule, do not provide a sound basis for recognizing a bright-line approach. *Wang Laboratories* cites two cases in support of the rule. The first, *Marvin Lumber & Cedar Co. v. Norton Co.*, 113 F.R.D. 588 (D.Minn. 1986), involved a suit by a window manufacturer against the manufacturer of the sealant used to make the windows. The plaintiff sought disqualification of the defendant's expert—an independent scientific laboratory—on the ground that the plaintiff had a prior and ongoing relationship with the expert. *Id.* at 590. The court accepted the plaintiff's characterization of that relationship and found that the expert was exposed to information regarding the plaintiff's product development, product designs, replacement of defective windows, and in-house testing. *Id.* at 591. The court found that these facts illustrated a "longstanding series of interactions" that gave the expert "a basic understanding of plaintiff's modus operandi, patterns of operation, [and] decision-making process." *Id.* Rather than declaring a bright-line rule, the *Marvin Lumber* court derived a case-sensitive approach from rules regarding attorney disqualification. The court crafted a test focusing on three considerations: (1) whether a confidential relationship existed with the adverse party, (2) whether the matters in the present action are "substantially related to" the matters for which the expert was previously involved, and (3) a balancing of "the interests and motivations of the attorneys and clients, and the public's interest in determining whether a motion for disqualification should be granted." *Id.* at 591–92. Under its view of the facts, the court concluded that disqualification was required, as the suit would place the expert "in an adversarial position against its past and present client." *Id.* at 592.

The second case cited by *Wang Laboratories, Miles v. Farrell*, 549 F.Supp. 82 (N.D.Ill.1982), addressed a plaintiff's motion to disqualify his treating physician from serving as an expert for the defendant in a medical malpractice action against a different doctor. The expert physician treated the patient-plaintiff both before and after being retained as the defendant's expert, and failed to disclose to the patient-plaintiff his relationship with the defendant at the time of the later treatment. *Id.* at 83. The court ruled that the doctor could not serve as an expert for the defendant. *Id.* at 84–85. Here, too, the court refused to impose a broad, bright-line rule; the court in *Miles* couched its decision in the specific terms of a physician's "fiduciary duty of confidentiality" to patients. *Id.* at 84. Thus, *Miles* did not declare a bright-line rule applicable to all experts, but instead crafted a rule specific to the doctor-patient relationship.

Neither of these cases went so far as to declare, as the *Wang Laboratories* court did, that every instance of an expert working for both sides in the same case requires disqualification. While both cases resulted in the disqualification of experts, they do not appear to stand for the broad proposition for which *Wang Laboratories* cites them.

Despite courts' general acceptance of *Wang Laboratories'* bright-line rule, only two federal cases have applied it to disqualify an expert. *See Howmedica*, 2007 WL 4440173; *Theriot*, 1996 WL 392149. In *Theriot*, the court disqualified an expert for the plaintiff under the bright-line approach because he had been employed by the defendant during and subsequent to a prior case which the court found to be functionally the same as the *Theriot* litigation. *Id.* at *1–*2. In *Howmedica*, an expert in a patent case was hired by the defendant, then performed some confidential work for the plaintiff, then once again performed work for the defendant during the same litigation. 2007 WL 4440173, at *1–*3. The court found that the bright-line approach required disqualification of the expert. *Id.* at *3. While both *Theriot* and *Howmedica* found the bright-line rule applied, neither relied absolutely on the rule as grounds for disqualification; both cases went on to note that the same result would be reached under the two-part test. *Id.* at *4; *Theriot*, 1996 WL 392149, at *2.

These observations raise some concern regarding the level of support for the bright-line test. Given the ever-growing significance of expert witnesses, clarification of the proper standard is needed. Courts should ensure that attorneys and experts have a clear idea of what conduct will result in disqualification; without detailed guidance, experts may be disqualified for conduct they did not know was inappropriate. At the same time, courts must seek to defend against the disclosure of confidential information. An appropriate standard, therefore, must weigh the interest in keeping relevant expert testimony available against the need to protect confidentiality.

■ This court finds that the most appropriate approach to expert disqualification is to read *Wang Laboratories* as crafting two distinct tests: the bright-line rule and the two-part test. Recognizing two separate tests and applying the bright-line rule apart from the two-part framework has several advantages. First, the bright-line rule, despite its lack of support, is intuitively appealing. As the *Wang Laboratories* court aptly notes, "no one . . . seriously contend[s]" that blatant side-switching by an expert within the same litigation should be permitted. *Wang Labs.*, 762 F.Supp. at 1248. In such cases, all parties would agree that the maintenance of judicial integrity mandates disqualification. Moreover, attorneys and experts in such circumstances could not legitimately complain that they did not know that their conduct was improper, as side-switching is the paradigm of inappropriate expert conduct. A second advantage to having two tests is an increase in judicial efficiency. In cases where the bright-line rule provides a clear basis for disqualification, judges may choose to avoid the time-consuming analysis associated with the two-part test. A final advantage to recognizing two distinct tests is that the availability of a bright-line approach will create more certain and predictable results in an entire class of cases; when cases fall under the bright-line rule, courts will not need to engage in the malleable reasonableness analysis required by the first prong of the two-part test.

For the reasons stated above, I **FIND** that there are two distinct tests for disqualifying experts for conflicts of interest. While I find that the bright-line rule applies to this case and requires disqualification, I also find that the same result would be reached under the two-part test. Although the bright-line rule is sufficient to mandate disqualification, this court, like the courts in *Theriot* and *Howmedica*, will nevertheless discuss both tests.

### B. The Two-part Test

■ The two-part test applied in *Wang Laboratories* and other cases asks the following questions: "First, was it objectively reasonable for the first party who claims to have retained the [expert] ... to conclude that a confidential relationship existed? Second, was any confidential or privileged information disclosed by the first party to the [expert]?" *Id.* In applying the two-part test, an expert should be disqualified only if both inquiries are answered in the affirmative. *Koch Refining*, 85 F.3d at 1181.

■ In applying the first prong of the test, courts focus on whether the party seeking disqualification "acted reasonably in assuming that a confidential or fiduciary relationship existed." *Cherry Hill*, 994 F.Supp. at 249. To evaluate the reasonableness of the party's assumption, courts consider a number of factors including:

whether the relationship was one of long standing and involved frequent contacts ..., whether the expert is to be called as a witness in the underlying case, whether the moving party funded or directed the formation of the opinion ... whether the parties entered into a formal confidentiality agreement, whether the expert was retained to assist in the litigation, ... whether work product was discussed or documents were provided to the expert, whether the expert was paid a fee, ... and whether the expert derived any of his specific ideas from work done under the direction of the retaining party.

*Hewlett–Packard Co.*, 330 F.Supp.2d at 1093. Courts have held that a confidential relationship existed when "the record supports a longstanding series of interactions, which have more likely than not coalesced to create a basic understanding of [the retaining party's] modus operandi, patterns of operations, decision-making pro-cess, and the like." *Koch Refining*, 85 F.3d at 1182 (quoting *Marvin Lumber*, 113 F.R.D. at 591). On the other hand, in cases where "the expert met [only] once with counsel, was not retained, was not supplied with specific data relevant to a case, and was not requested to perform any services," courts have declined to find a confidential relationship existed. *Id.* (quoting *Mayer v. Dell*, 139 F.R.D. 1, 3–4 (D.D.C.1991)).

■■ The second prong of the test requires the court to consider whether the expert received or had reasonable access to information and whether that information was confidential. In the specific context of expert disqualification, "[c]onfidential information essentially is information 'of either particular significance or [that] which can be readily identified as either attorney work product or within the scope of the attorney-client privilege.'" *Hewlett–Packard Co.*, 330 F.Supp.2d at 1094 (quoting *Paul v. Rawlings Sporting Goods Co.*, 123 F.R.D. 271, 278 (S.D.Ohio 1988)). Confidential information in this context includes, among other things: "discussions of the [retaining party's] strategies in the litigation, the kinds of experts [the party] expected to retain, [the party's] views of the strengths and weaknesses of each side, the role of each of the [party's] witnesses to be hired, and anticipated defenses." *Koch Refining*, 85 F.3d at 1181 (quoting *Mayer*, 139 F.R.D. at 4). The confidential information must also be sufficiently related to the instant litigation to merit disqualification. *Cherry Hill*, 994 F.Supp. at 250.

■ Finally, the court should also "balance the competing policy objectives" in determining expert disqualification, which include "preventing conflicts of interest," "maintaining the integrity of the judicial process," maintaining accessibility to experts with specialized knowledge, and

encouraging experts to "pursue their professional calling." *Cordy*, 156 F.R.D. at 580. The court should also consider "whether another expert is available and whether the opposing party will be unduly burdened by having to retain a new expert." *Cherry Hill*, 994 F.Supp. at 251.

### III. Evidence Presented

The plaintiffs proffered evidence intended to establish a basis for disqualification under either test. First, the plaintiffs claim that the *Leach* litigation is so substantially related to the current litigation to amount to the same case and justify disqualification under the bright-line rule from *Wang Laboratories*. They note that both suits involve DuPont's alleged contamination of local drinking water supplies with C–8 and that the only material difference is the location of the water supply. (Mem. Supp. Pls. Mot. Disqualify 12.)

The plaintiffs also proffered evidence related to the two-part test. As to whether the Firms had a confidential relationship with Dr. Anderson, the plaintiffs offer Dr. Anderson's retention letter regarding her employment for the *Leach* litigation. The retention letter, written by the Firms, states: "This letter confirms that you have been retained by the [Firms] on behalf of their clients, to provide expert services for the Plaintiffs in connection with the referenced litigation [ (*Leach* ) ]. The expert services you are performing are confidential." (Retention Letter, Mem. Supp. Pls.' Mot. Disqualify, Ex. A.) The plaintiffs further submit the affidavit of Robert A. Bilott, counsel for the plaintiffs in the *Leach* case and the attorney responsible for retaining Dr. Anderson in that litigation. Mr. Bilott states that "Dr. Anderson and her firm were retained to provide expert toxicology and risk assessment services in connection with assessing the safety of C–8 in human drinking water supplies for plaintiffs in the *Leach* litigation." (Robert A. Bilott Aff. ¶ 3, Mem. Supp. Pls.' Mot. Disqualify.) According to Mr. Bilott, the relationship between the Firms and Dr. Anderson and her firm, Sciences International, spanned several years. (*Id.* ¶ 5.) Mr. Bilott stated in his *in camera* testimony that his records show that he spoke with Dr. Anderson on the telephone regarding the case approximately twenty-eight times during the period in which she was retained. The plaintiffs also argue that although Dr. Anderson transferred primary responsibility for the case to Dr. David Gray after about a year, she continued to monitor and supervise Dr. Gray's work. (Mem. Supp. Pls. Mot. Disqualify 2–3 (citing Bilott Aff. ¶¶ 5–8).)

As to the second prong, the plaintiffs asserted at argument and Mr. Bilott stated in his testimony that documents he provided to Dr. Anderson revealed confidential matters of case strategy. During the *in camera* portion of the hearing, the plaintiffs focused on a memorandum prepared by Mr. Bilott that summarized for Dr. Anderson the facts and background science in the *Leach* case as well as counsel's views on that case's key issues and strategies. Mr. Bilott's *in camera* testimony further indicated that the documents he provided to Dr. Anderson were chosen from among a large pool of available information, and that the selection process was based on what he deemed most central to the *Leach* plaintiffs' case.

With respect to the fairness and policy factors, the plaintiffs allege that the defendant would not be substantially harmed if Dr. Anderson is excluded because the defendant had prior knowledge of her past employment with the Firms in the *Leach* case. The plaintiffs point to past written expert disclosures identifying Dr. Gray, and his employer Sciences International, as a testifying expert as well as past billing

statements signed by Dr. Anderson, as evidence of the defendant's awareness of the Firms' relationship with Dr. Anderson and Sciences International. (Mem. Supp. Pls.' Mot. Disqualify 3.) Additionally, plaintiffs note that the *Leach* discovery documents have been ordered to be reproduced in the present case, thus giving the defendant further information from which to infer a prior relationship. (*Id.* at 3–4.)

The defendant argues that the disqualification of Dr. Anderson is not warranted under either test. The defendant first asserts that the bright-line rule from *Wang Laboratories* should not apply because the present litigation is distinguishable from the *Leach* case. Most notably, the defendant points out that the exposure levels to C–8 in *Leach* were significantly higher than the levels alleged in this litigation, further noting that after *Leach*, "an independent panel of epidemiologists was necessary to design and conduct studies to determine whether [C–8] causes human disease" even at those higher levels. (Def.'s Resp. Opp'n Pls.' Mot. Disqualify 6–7.) Based on this, the defendant claims that the instant case is materially different than *Leach*. (*Id.* at 7).

The defendant attacks the plaintiffs' case for disqualification under the two-part test by arguing that the plaintiffs have improperly characterized Dr. Anderson's relationship with the Firms. The defendant claims that Dr. Anderson had a limited role in which she merely agreed to review some scientific information and provide a preliminary reaction to Mr. Bilott. (*Id.*) Dr. Anderson asserts that it is customary in her line of work for retention letters to be exchanged before any materials are shared or before any decisions are made as to an expert's involvement in a case. (Decl. of Elizabeth L. Anderson ¶ 6, Def.'s Resp. Opp'n Pls.' Mot. Disqualify, Ex. 1.) According to Dr. Anderson, her previous research led her to disagree with certain conclusions made in the reports she was asked to review. (*Id.* ¶ 8.) Because she had already formed an expert opinion opposite to these conclusions, she asserts that she decided not to testify on behalf of the plaintiffs. (*Id.* ¶ 9.) She suggested that her colleague Dr. David Gray, who also worked at Sciences International, may be interested in consulting with Mr. Bilott based on Dr. Gray's previous research. Although Mr. Bilott retained Dr. Gray (he is currently identified as an expert witness for the plaintiffs), Dr. Anderson asserts that she did not supervise or review his work and was not aware of what work Dr. Gray was doing for Mr. Bilott. (*Id.*) Dr. Anderson acknowledges that she signed company invoices, including those billing Dr. Gray's time to the Firms, but asserts this was simply an administrative matter and does not reflect her degree of involvement with the Firms. (*Id.* ¶ 10.)

As to whether any confidential information was provided to her, Dr. Anderson asserts:

> I do not recall receipt of any confidential documents from Mr. Bilott. . . . To the best of my recollection, I certainly have not reviewed any confidential documents that discuss his strategy, nor have I discussed strategies or any strategic issues with Mr. Bilott or his colleagues. I have at no time participated in "almost daily" calls with Mr. Bilott or his colleagues to discuss "highly confidential issues of case strategy and expert testimony in support of that strategy."

(*Id.* ¶ 7.)

With respect to the fairness factors, the defendant argues that it had no notice of Dr. Anderson's prior association with the Firms and that it was their understanding that Dr. Gray was the plaintiffs' expert. The defendant provides the declaration of

Libretta Stennes, one of its counsel. Ms. Stennes asserts that the discovery the plaintiffs allege put the defendant on notice of Dr. Anderson's relationship was produced one week before the parties engaged in mediation which resulted in the settlement of the *Leach* case. (Decl. of Libretta Stennes ¶ 3, Def.'s Resp. Opp'n Pls.' Mot. Disqualify, Ex. 2.) Ms. Stennes argues that, due to this timing, it is unlikely that anyone reviewed the 3,500 pages of discovery, and that even if they had, Dr. Anderson was only referenced in four places: a print-out from the Sciences International website, a letter to Dr. Gray, on the signature line of six invoices, and on a letter from an international journal to Dr. Gray. (*Id.* ¶¶ 4–5.)

## IV. Analysis

The *Leach* litigation and the instant case are so intertwined with respect to their use of experts that for the purpose of expert disqualification, they functionally constitute the same case. Factually, both cases involve the same defendant, the same chemical, the same alleged tortious behavior, and plaintiffs who were allegedly harmed due to their water consumption. In addition to these factual similarities, the cases share the central scientific issue of whether C–8 is toxic to humans. The plaintiffs in the instant case, moreover, were originally among the *Leach* plaintiffs but were carved out because C–8 levels in their water were either undetectable or below 0.05 parts per billion. (Am. Compl. ¶ 43.)

Most importantly, the two cases involve the same experts (Drs. Anderson and Gray) intending to give opinions regarding the same scientific methodology. Here the plaintiffs depend upon the same methodology that the Firms hoped Dr. Anderson would employ when they retained her in *Leach*. This methodology uses principles of risk assessment to assert that the entire class of residents is at risk for disease regardless of their individual levels of exposure. (Def.'s Resp. Opp'n Pls.' Mot. Disqualify 2; *see also* Am. Compl. ¶¶ 71, 74.) While Dr. Anderson has declared that she does not accept the methodology and that this disagreement compelled her not to testify for the *Leach* plaintiffs, her involvement in *Leach* exposed her to the Firms' strategy with respect to that methodology. In the present litigation, as they would have in *Leach*, the plaintiffs call upon Dr. Gray to provide an opinion supporting this methodology. Because the plaintiffs' case in this litigation is based on the same intended use of experts, it will be treated as the same case as *Leach* for purposes of the disqualification analysis.[2]

 Because these two cases are functionally the same for the specific purpose of the disqualification analysis, the bright-line rule requires disqualification of Dr. Anderson. *See, e.g., Theriot,* 1996 WL 392149 (applying the bright-line disqualification rule when a new case was closely enough related to prior litigation to be deemed the same case). Under the rule from *Wang Laboratories,* an expert retained by the adverse party in the same

**2.** Also pending before the court is the plaintiffs' Motion for Class Certification [Docket 188]. While the court has found that the instant case and *Leach* are sufficiently similar to constitute the same case for the purpose of expert disqualification, this finding does not bear on the class certification question, for which this court must conduct an independent Rule 23 analysis. This court finds *Leach*

and the instant case to be functionally the same for the purpose of disqualification due to the specific finding that the two cases use the same experts to apply the same methodology to the same allegations. This determination is significantly narrower and focuses on fewer facts than the multifaceted Rule 23 question of class certification.

litigation who has received confidential information from the adverse party should be disqualified. *Wang Labs.*, 762 F.Supp. at 1248. Disqualification often serves to protect the integrity of the judicial system; where, as here, an expert plainly switches sides in what is essentially the same case, the maintenance of judicial integrity requires disqualification.

 Even if this were not the sort of clear case governed by the bright-line rule from *Wang Laboratories,* the two-part test would require the same result. Under the first prong of the test, the plaintiffs reasonably believed that they had a confidential relationship with Dr. Anderson during the *Leach* litigation. Dr. Anderson signed a retainer agreement as well as multiple confidentiality agreements. The plaintiffs also produced evidence showing that Dr. Anderson, after receiving documents from the plaintiffs, independently marked some as "confidential." At a minimum, the relationship between the plaintiffs and Dr. Anderson lasted several months spanning November 2001 to late February 2002. During this time, Mr. Bilott sent Dr. Anderson numerous letters containing information Mr. Bilott thought relevant to his case and spoke with Dr. Anderson on the phone regarding the case approximately twenty-eight times. This history of interactions does not indicate a sporadic or informal relationship, but one which involved frequent and seemingly structured communications. The factors discussed in *Hewlett–Packard* support the conclusion that the Firms were reasonable in believing that they had a confidential relationship with Dr. Anderson.

In terms of the second prong of the test, confidential and privileged information was disclosed to Dr. Anderson while she was retained by the plaintiffs. Though some of the information received by Dr. Anderson from the plaintiffs could be deemed public or discoverable information in other contexts, in this case it is privileged as protected work product. The plaintiffs' attorneys provided to Dr. Anderson information assembled after the plaintiffs' attorneys engaged in a selection process from among a large pool of documents. According to Mr. Bilott, this selection process was based on what he deemed to be most central to the plaintiffs' case and thus most necessary to Dr. Anderson's assessment. Courts acknowledge that the document selection process "represent[s] the mental impressions of [the party's] counsel and [is] protected work product." *Cordy,* 156 F.R.D. at 580 (citing *Sporck v. Peil,* 759 F.2d 312, 315 (3d Cir.1985)). The plaintiffs also provided Dr. Anderson with a memorandum prepared by Mr. Bilott which summarized the case and discussed what he as counsel thought to be the case's key legal issues. Like the selection process, this document constitutes confidential and protected work product.

Because the test's questions have each been answered affirmatively, Dr. Anderson should be disqualified under the two-part test. *Koch Refining,* 85 F.3d at 1181. Beyond the two-part test, the fairness and policy factors previously discussed also favor disqualification. As the plaintiffs argue, the defendant had several sources of information available to it that indicated a prior connection between the plaintiffs, Dr. Anderson, and her company Sciences International. Although access to this information does not establish definitively that the defendant knew that the plaintiffs had previously retained Dr. Anderson, it does bear on the question of whether it would be fair to disqualify her use by the defendant. The disqualification of Dr. Anderson does not unduly burden the defendant because it does not leave the defendant without an expert. To the contrary, Dr.

Anderson is just one of many proposed experts for the defendant.

Accordingly, the court **GRANTS** the plaintiffs' motion to disqualify Dr. Elizabeth L. Anderson as an expert witness for the defendant.

The court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party and to publish the decision on the court's website at www.wvsd.uscourts.gov.