**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 24-1450**

BRAINCHILD SURGICAL DEVICES, LLC, a New York limited liability company, on behalf of themselves and those similarly situated,

Plaintiff - Appellant,

v.

CPA GLOBAL LIMITED, a foreign entity formed under the laws of the Island of Jersey, Channel Islands,

Defendant - Appellee.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Rossie David Alston, Jr., District Judge. (1:21-cv-00554-RDA-LRV)

Argued: January 28, 2025                    Decided: July 8, 2025

Before DIAZ, Chief Judge, and QUATTLEBAUM and RUSHING, Circuit Judges.

Affirmed in part, reversed in part and remanded by published opinion. Judge Quattlebaum wrote the opinion, in which Chief Judge Diaz and Judge Rushing joined.

**ARGUED:** Ryan Benjamin Abbott, BROWN NERI SMITH & KHAN, LLP, Los Angeles, California, for Appellant. William Balden Adams, QUINN EMANUEL URQUHART & SULLIVAN, LLP, New York, New York, for Appellee. **ON BRIEF:** Robert Franklin Powers, MCCLANAHAN POWERS, PLLC, Falls Church, Virginia, for Appellant. Eric C. Lyttle, James Matthew Hamann, Washington, D.C., Anthony P. Alden, Michael L. Fazio, QUINN EMANUEL URQUHART & SULLIVAN, LLP, Los Angeles,

2

California, for Appellee.

————————————

QUATTLEBAUM, Circuit Judge:

This appeal involves a commercial dispute between Brainchild Surgical Devices, LLC, a medical device developer, and CPA Global Limited, a company Brainchild hired to maintain the patents it files across the world. After Brainchild sued CPA, claiming that it violated a contract by fleecing Brainchild with overcharges, the district court excluded Brainchild's expert witnesses and granted summary judgment for CPA. The court also dismissed Brainchild's fraud claim and denied leave to amend it.

Brainchild's appeal requires us to address two key principles. First, in assessing a breach of contract claim, the actual text of the contract is paramount. Parties to written agreements rightfully expect courts to enforce their terms. And like most jurisdictions, Virginia—whose law governs this contract—embraces this principle. In Virginia, "[t]he pole star for the construction of a contract is the intention of the contracting parties *as expressed by them in the words they have used*." *Ames v. Am. Nat'l Bank of Portsmouth*, 176 S.E. 204, 216 (Va. 1934) (emphasis in original). Applying that maxim here, we agree with the district court's conclusion that most of Brainchild's breach of contract theories are inconsistent with the written contract. However, we reverse the district court's summary judgment order as to one of Brainchild's theories of breach. The text of the contract precludes CPA's interpretation, and Brainchild has raised a genuine dispute of fact on that one theory.

Because one of Brainchild's breach of contract theories survives summary judgment, we must also address the second issue—the proper role of expert witnesses in civil litigation. "[E]xpert witnesses have the potential to 'be both powerful and quite

3

misleading.'" *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993)). Given that potential, Federal Rule of Civil Procedure 702 "imposes a special gatekeeping obligation on the trial judge." *Nease v. Ford Motor Co.*, 848 F.3d 219, 230 (4th Cir. 2017). In excluding Brainchild's expert testimony to the extent the experts lacked qualifications, offered legal opinions and failed to reveal the bases of their opinions, the district court acted within its discretion. But in disqualifying an expert because his previous employment with CPA exposed him to confidential business information—but not information about CPA's litigation strategies—the court erred.

## I.

Brainchild, based in Brooklyn, New York, develops medical devices. It protects the new technology in these devices by patenting them in the United States and other countries. To maintain a patent, Brainchild must pay renewal fees to the patent registry of each jurisdiction where the patent is pending or issued. Timely renewal is critical; Brainchild could lose or abandon a patent without it.

CPA, a multinational company based on the island of Jersey, provides patent renewal services.[1] It manages renewals for clients across the world, ensuring that the proper

---

[1] Not to be confused with the state of New Jersey, the island of Jersey sits twelve miles off the coast of France in the English Channel. Like the other Channel Islands, Jersey is one of "the last remaining territories of the Dukes of Normandy." *See* PETER HUNT, A BRIEF HISTORY OF JERSEY 4 (1998). Its loyalty has been to the English Crown ever since "William of Normandy conquered England in 1066." *Id.* Jersey therefore owes no

4

patent registry receives payment on time in the proper currency. To perform prompt renewals in many jurisdictions, CPA monitors local patent laws, converts currency, hedges against fluctuation, obtains insurance and manages local agents where needed.

In April 2018, Brainchild entered a Renewal Services Agreement with CPA. Under that agreement, CPA agreed to "handle the payment of [Brainchild's] patent and design renewal fees" and to provide it with quarterly renewal notices. J.A. 313. For its part, Brainchild committed to reviewing the renewal notices and informing CPA of any patents that should be abandoned. It agreed that CPA should renew the non-abandoned patents. Brainchild also agreed to pay CPA through a series of fees. First, it agreed to pay a "Service Charge" of "USD 200 for each renewal." J.A. 314. Second, it agreed to pay an "Official Charge" and a "Country Charge." J.A. 318. Section 5.3 of the Renewal Services Agreement's attached terms and conditions describes those charges:

> You shall also pay as Charges to us an amount comprising our estimated charges, as at the time of a Renewal Notice, in respect of submissions to the relevant registries in each jurisdiction ("**Official Charge**") which vary from time to time and, where applicable, a **Country Charge**, which is set out in a tariff (which may vary from time to time), a current copy of which is available upon request. The Official Charge and/or the Country Charge may be subject to a charge for funds management in accordance with Clause 5.6.

*Id.* Last, Brainchild agreed to pay a Funds Management Adjustment. Section 5.6 details that obligation:

---

allegiance to the Parliament of the United Kingdom. Given its strategic position, the island long served as a base for privateering and smuggling in the many conflicts between England and France. *See id.* at 5. Today, the island features a distinctive culture that is not entirely English or French.

> If the Official Charge, Country Charge and/or other sums of money require to be converted from one currency into [U.S. Dollars], such sums or Charges shall be calculated using our CPA Global rates which include provision for funds management e.g. currency exchange/risk exposure, managing global transactions, credit risk and the financing of renewals payments.

*Id.*

In section 5.7, CPA committed to estimating the total aggregate renewal charge in each Renewal Notice. So long as CPA received instruction to proceed, it would renew the patents, and Brainchild agreed to pay CPA "such Charges as shown in the Renewal Notice in respect of the Services." *Id.*

True to the agreement, CPA provided Brainchild with periodic Renewal Notices that identified the patent(s) at issue, estimated the total renewal fee and contained their own distinct terms and conditions. *See, e.g.*, J.A. 213–228, 323–25. For example, the March 2021 Renewal Notice provided an estimated total fee—without breaking out the Service, Official, Country or Funds Management charges—of $1,200 to renew a particular patent. The accompanying terms and conditions are very similar to those of the Renewal Services Agreement but contain a few additional details. They describe the Service Charge as "relat[ing] to the systems and CPA Global personnel that determine which intellectual property rights need to be renewed in which jurisdictions at which point in time." J.A. 324. They describe the Official Charge as "the amount we pay to relevant registries in each jurisdiction." *Id.* And they describe the Country Charge as:

> [R]elat[ing] to the infrastructure, CPA Global personnel and third parties (where appropriate) required in order to execute a renewal in a particular jurisdiction and may be subject to a charge for funds management (as set out in section 5.4). CPA Global maintains a schedule of applicable Country

6

> Charges which may be updated from time to time, a current copy of which is available on request.

*Id.* The Renewal Notice terms and conditions describe the Funds Management Adjustment with the same language as the Renewal Services Agreement.

Brainchild used CPA's patent renewal services for three years without incident. But in April 2021, Brainchild entered discussions with a competitor of CPA's due to concern that CPA was overcharging. At the same time, Brainchild paid its final invoice to CPA. In May, Brainchild terminated the Renewal Services Agreement.

Brainchild then sued CPA for breach of contract, fraud and other claims not relevant here.[2] According to the complaint, the Country Charge and the Funds Management Adjustment were supposed to merely pass through CPA's actual costs. Despite that, Brainchild alleged CPA marked those amounts up to bolster its profits. Last, Brainchild asserted that CPA covered up these overcharges by only providing an aggregate estimate of charges instead of itemizing them.

CPA moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). The district court denied the motion as to the breach of contract claim. *See Brainchild Surgical Devices, LLC v. CPA Glob. Ltd.*, No. 1:21-cv-554, 2022 WL 992734, at *2–5 (E.D. Va. Mar. 31, 2022). It dismissed the fraud claim without prejudice because Brainchild failed to satisfy Federal Rule of Civil Procedure 9(b)'s particularity rule. The court granted leave to

---

[2] Brainchild proposed a putative class of all persons in the United States who entered into CPA's standard Renewal Services Agreement. But Brainchild has not yet moved to certify a class.

7

amend and instructed Brainchild to plead fraud with particularity as to "which material facts were concealed, who is responsible for the concealing, and the manner of concealment." *Id.* at *4. Finally, the court dismissed the other claims with prejudice.

Brainchild filed an amended complaint with two causes of action, one for breach of contract and the other for fraud. In addition to claiming CPA's overcharges violated express terms of the agreement, Brainchild alleged it breached the contract's implied covenant of good faith and fair dealing. CPA moved to dismiss the fraud claim. *See Brainchild Surgical Devices, LLC v. CPA Glob. Ltd.*, No. 1:21-cv-554, 2023 WL 159769, at *2–6 (E.D. Va. Jan. 11, 2023). The district court again found Brainchild failed to plead fraud with particularity, despite the court's explicit instructions in its earlier order. The court dismissed the fraud claim with prejudice and denied leave to amend as futile.

The parties proceeded with discovery on the breach of contract claim. During that discovery, the parties disclosed expert witnesses. Relevant to this appeal, Brainchild disclosed David Cass and John Keogh. Cass, who had experience with international business and contracts, opined that CPA overcharged Brainchild by not limiting the Country Charges and the Funds Management Adjustments to the actual costs incurred by CPA. Keogh—a former employee of CPA who later went to work for CPA's competitor RenewalsDesk—offered similar opinions.

The parties cross-moved for summary judgment. CPA also moved to exclude Cass' and Keogh's opinions. The district court resolved these motions together. First, the court granted CPA's motion to exclude Cass' expert testimony because, according to the court, he (1) was unqualified and (2) improperly offered legal opinions. Second, the district court

8

granted CPA's motion to disqualify Keogh because he (1) had a confidential relationship with CPA and (2) disclosed relevant confidential information about CPA. And in the alternative, the district court said it would have excluded Keogh's testimony for failure to disclose all bases for his opinion and for improperly offering legal conclusions.

The court then addressed the cross-motions for summary judgment. It denied Brainchild's motion because its primary theory—that the Country Charge and Funds Management Adjustment are limited to pass-through costs—was unsupported by the Renewal Services Agreement and Renewal Notices. The court rejected Brainchild's alternate theory that CPA breached the implied covenant of good faith because CPA disclosed all information required by the contract. So, the court concluded CPA was entitled to summary judgment on the breach of contract claim.

## II.

Brainchild now appeals (1) the grant of CPA's summary judgment motion and the denial of its own summary judgment motion; (2) the grant of CPA's evidentiary motions; and (3) the denial of leave to amend its fraud claim.[3] We address these challenges in turn.

### A.     Summary Judgment

We begin with Brainchild's arguments that the district court improperly granted CPA's motion for summary judgment, and denied its motion, on the breach of contract

---

[3] The district court exercised diversity jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). We have jurisdiction of this appeal under 28 U.S.C. § 1291.

9

claim.[4] We first consider Brainchild's theory that CPA's Country Charges and Funds Management Adjustment fees were not, as the contract required, pass-throughs of CPA's costs. We then consider Brainchild's theory that CPA assessed Country Charges unrelated to the costs for renewing patents in a particular jurisdiction. Finally, we address Brainchild's implied covenant of good faith and fair dealing theory as part of the breach of contract count.

### 1. Pass-through Costs Theory

Brainchild first argues it should win at summary judgment because the Country Charge and Funds Management Adjustment can only be interpreted as pass-through cost provisions. Said another way, Brainchild believes CPA can only pass through its own costs—without any markup—under the Country Charge and Funds Management Adjustment. In the alternative, Brainchild argues that its reasonable interpretation of the contract creates ambiguity so that a jury must decide the proper interpretation. *See Atalla v. Abdul-Baki*, 976 F.2d 189, 193 (4th Cir. 1992).

---

[4] We address the cross-motions for summary judgment on a *de novo* review. *See Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001). Summary judgment is appropriate only when "there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). For cross-motions for summary judgment, we consider each motion separately and resolve "factual disputes and . . . rational inferences in the light most favorable to the party opposing that motion." *See Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quoting *Wightman v. Springfield Terminal Ry. Co.*, 100 F.3d 228, 230 (1st Cir. 1996) (internal quotation mark omitted)).

To consider these arguments, we start with the text of the contract. The Renewal Services Agreement describes the Country Charge as "set out in a tariff (which may vary from time to time), a current copy of which is available upon request." J.A. 318. The Renewal Notices state that the Country Charge "relates to the infrastructure, CPA Global personnel and third parties (where appropriate) required in order to execute a renewal in a particular jurisdiction."[5] J.A. 324. Nothing in that language limits the charge to CPA's own costs. To the contrary, it only says the charge must "relate[] to" CPA's infrastructure, "personnel and third parties . . . required in order to execute a renewal in a particular jurisdiction." *Id.*

According to Brainchild, "relates to" means "limited to" CPA's costs. But that's not what "relates to" means. "[R]elates to" requires the Country Charge to have a connection with those costs. *See Barnett Bank of Marion Cnty., N.A. v. Nelson*, 517 U.S. 25, 38 (1996) (describing "relates to" in other contexts as "highly general" and expressing "a connection with or reference to" (citing *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 47 (1987)). Since the contract's plain language only requires *a relationship*, not a strict passing on of those costs without any markup, it does not support Brainchild's pass-through cost interpretation of the Country Charge. *See Bridgestone/Firestone, Inc. v. Prince William Square Assocs.*,

---

[5] We consider both the Renewal Services Agreement and the Renewal Notices as the contract. The Renewal Notices, which Brainchild paid on, tell us that "[t]hese conditions shall govern and *be incorporated* into the contract made by CPA Global . . . with customers (you) for the administration of intellectual property rights (Services)." J.A. 324 (emphasis added).

463 S.E.2d 661, 664 (Va. 1995) ("When contract terms are clear and unambiguous, a court must construe them according to their plain meaning.").

If there was any doubt, consider the charge located next door in the contract to the Country Charge. *See Pocahontas Min. Ltd. Liab. Co. v. CNX Gas Co., LLC*, 666 S.E.2d 527, 531 (Va. 2008) ("In ascertaining the parties' intention regarding specific contract provisions, we consider the document as a whole."). Immediately before describing the Country Charge, the Renewal Notices describe the Official Charge as "the *amount we pay* to relevant registries in each jurisdiction." J.A. 324. (emphasis added).[6] That language limits what CPA can assess as an Official Charge to the amount it pays. And it shows that when the parties intended to limit a charge to CPA's costs, they explicitly did so. *See Bentley Funding Grp., L.L.C. v. SK & R Grp., L.L.C.*, 609 S.E.2d 49, 56 (Va. 2005) (applying the *expressio unius* principle to conclude that a written contract's omission of a particular term "shows an intent to exclude it"). The contract's description of the Country Charge is nothing like that. The contract does not limit the Country Charge to CPA's actual costs.

Turning to Brainchild's argument about the Funds Management Adjustment— which applies when CPA must convert currency to effect Brainchild's renewals—the agreement states that CPA will use "our CPA Global rates which include provision for funds management e.g. currency exchange/risk exposure, managing global transactions,

---

[6] CPA notes the Official Charge is limited to pass-through costs. *See* CPA Br. 21.

12

credit risk and the financing of renewals payments." J.A. 318. Brainchild argues this language only covers "costs associated with required currency exchange." Brainchild Br. 31. But that is not what the contract says. In fact, it specifically mentions more than just currency exchange, including currency exchange risk, credit risk, financing and transaction management, which are factors beyond currency exchange. Virginia contract law does not treat words in a contract as meaningless. *See City of Chesapeake v. States Self-Insurers Risk Retention Grp.*, 628 S.E.2d 539, 541 (Va. 2006) ("No word or clause in the contract will be treated as meaningless if a reasonable meaning can be given to it . . . ." (quoting *D.C. McClain, Inc. v. Arlington Cnty.*, 452 S.E.2d 659, 662 (Va. 1995)). Also, "e.g." indicates the nonexclusive nature of the listed elements of funds management. *See E.G.*, BLACK'S LAW DICTIONARY (12th ed. 2024) (defining "e.g." as "[f]or example"). Thus, the contract's plain text does not support Brainchild's pass-through cost interpretation of the Funds Management Adjustment.[7]

Brainchild's pass-through interpretations of the Country Charge and Funds Management Adjustment conflict with the unambiguous language of the contract. Thus,

---

[7] Brainchild argues that CPA breached by assessing the Funds Management Adjustment even when no currency conversion was required. This argument fails, however, because Brainchild raises no genuine dispute of fact. The record reflects CPA applied the adjustment to Brainchild's renewals in Canada, the EU, Great Britain, Germany, Australia, Japan and Spain—all of which required currency conversion. Brainchild can only speculate that the adjustment is covering internal and personnel costs paid in U.S. Dollars.

13

we agree with the district court that CPA, not Brainchild, is entitled to summary judgment on this theory of breach.

## 2. Related to Theory

Brainchild alternatively argues CPA breached the contract by assessing Country Charges unrelated to "infrastructure, CPA Global personnel and third parties (where appropriate) required in order to execute a renewal in a particular jurisdiction." J.A. 324 Brainchild believes that contrary to the agreement, CPA's Country Charges were not related to its infrastructure, personnel or third-party costs for a particular jurisdiction. In response, CPA counters that the contract does not require Country Charges to relate to costs incurred for a particular renewal or even in a particular jurisdiction.

While Brainchild's pass-through costs theory ignored the language of the contract, CPA's interpretation of the scope of the Country Charge does the same thing. By the contract's unambiguous terms, the Country Charge must relate to infrastructure, personnel and third parties "required in order to execute a renewal in *a particular* jurisdiction." *Id.* (emphasis added). True, as already discussed, "relates to" is broad. But the rest of the Country Charge description focuses its meaning. A Country Charge must relate to specific items (infrastructure, personnel and third parties) in a specific context (required to execute a renewal in a particular jurisdiction). There is no way to read "in a particular jurisdiction" to mean companywide. And there is no way to read "infrastructure, CPA Global personnel and third parties (where appropriate) required in order to execute a renewal" to represent mere examples of what can be charged. Under the contract, if CPA assesses a Country Charge for a renewal in Germany, the charge must relate to the infrastructure, personnel

14

and third parties needed to execute renewals in Germany. CPA may not calculate the Country Charge based solely on companywide aggregate costs, without regard to the infrastructure, personnel and third parties needed for that jurisdiction.

With that understanding, we assess CPA's summary judgment motion, which means we must construe the record in the light most favorable to Brainchild. *See Rossignol*, 316 F.3d at 523. CPA's COO Gordon Samson testified it would be "impracticable" to assess the infrastructure, personnel and third-party costs on a transaction-by-transaction basis. J.A. 1424. He then said "



." J.A. 1425. Samson continued, explaining that the Country Charge:



J.A. 1428. According to Samson, "



." *Id.*

This testimony suggests that CPA aggregated costs companywide when deriving the Country Charge, unrelated to the jurisdiction-specific variables contemplated in the contract. But as already discussed, the contract requires that Country Charges relate to CPA's infrastructure, personnel and third-party costs in particular jurisdictions. Considering the evidence in the light most favorable to Brainchild, a genuine dispute of

fact exists as to whether CPA assessed Country Charges to Brainchild that relate to infrastructure, personal and third parties required for renewal in the particular jurisdiction.

At oral argument, CPA asserted an exhaustion defense—that Brainchild already had a chance to raise concerns with the estimated charges before paying each renewal. *See* Oral Arg. 23:48–26:21. Specifically, CPA pointed to section 5.7 of the Renewal Services Agreement's terms and conditions, which says if CPA has instructions to proceed with a renewal, "we shall be entitled to submit an invoice for, and you shall pay, such Charges as shown in the Renewal Notice in respect of the Services." J.A. 318. According to CPA, Brainchild failed to exhaust any challenge to the Renewal Notice quotes and is "no longer able to contest the charges." Oral Arg. 31:01–32:10.

For two reasons, we disagree. First off, "[i]t is well-settled that a defense may not be first raised on appeal." *Suarez Corp. Indus. v. McGraw*, 125 F.3d 222, 226 (4th Cir. 1997). Second, we reject CPA's attempt to turn a sequencing provision into an exhaustion requirement that immunizes a potential breach. Section 5.7 required Brainchild to pay the estimated total charge after instructing CPA to proceed with that renewal. Nothing in section 5.7 or anywhere else in the contract suggests that if Brainchild paid an invoice before disputing the charge, it forfeited a breach of contract claim. Of course, Brainchild

16

could have flagged overpayment concerns before paying the invoice; but it can now bring a breach of contract action for potential breach.[8]

Thus, we reverse the district court's grant of summary judgment for CPA, and remand for further proceedings, on Brainchild's theory that CPA breached the contract by assessing Country Charges unrelated to personnel, infrastructure and third parties necessary for renewal in a particular jurisdiction.

### 3. Implied Covenant of Good Faith and Fair Dealing

Brainchild separately argues we should reverse the grant of summary judgment because CPA breached the implied covenant of good faith and fair dealing. In Virginia, "every contract contains an implied covenant of good faith and fair dealing." *Wolf v. Fed. Nat'l Mortg. Ass'n*, 512 F. App'x 336, 345 (4th Cir. 2013) (quoting *Enomoto v. Space Adventures, Ltd.*, 624 F. Supp. 2d 443, 450 (E.D. Va. 2009)). Under that implied covenant, when a party exercises contractual rights, it may not do so dishonestly or in bad faith. *See id.* If CPA acted pursuant to valid contractual rights, then Brainchild must demonstrate "sufficient evidence that these rights were exercised in bad faith." *Id.* Virginia law does

---

[8] Below, CPA argued for—and the district court applied—the voluntary payment doctrine to Brainchild's payment of a February 2021 invoice, which was the last invoice CPA issued. We agree that Brainchild had "the means of [full] knowledge" of all facts when it "voluntarily and without compulsion pa[id]" that renewal in April 2021. *Newton v. Newton*, 118 S.E.2d 656, 659 (Va. 1961). At the time Brainchild paid, it already suspected overcharging and had contacted a competitor patent renewal service. So, the voluntary payment doctrine bars Brainchild from recovering the final payment. But we reject CPA's argument that section 5.7 bars Brainchild's breach of contract claim on *any* of its payments.

17

not permit the implied covenant to "be the vehicle for rewriting an unambiguous contract in order to create duties that do not otherwise exist." *Ward's Equip., Inc. v. New Holland N. Am., Inc.*, 493 S.E.2d 516, 520 (Va. 1997).

Brainchild argues CPA dishonestly concealed its pricing methodology when it provided only total estimate charges in the Renewal Notices. It claims the implied covenant of good faith and fair dealing required CPA to break out the components of the charges. But section 5.7 of the Renewal Services Agreement did not require such itemization. It only bound CPA to "give [its] best estimate of the total aggregate Charges in each Renewal Notice." J.A. 318. CPA did just that. So, to succeed, Brainchild must show CPA acted dishonestly or in bad faith. *See Wolf*, 512 F. App'x at 345; *Enomoto*, 624 F. Supp. 2d at 450. But it offers no evidence on this point. CPA provided an estimate of the total charges in the Renewal Notices just as the contract required. Accepting Brainchild's argument would require us to write in additional disclosure obligations to an unambiguous contract. *See Ward's Equip.*, 493 S.E.2d at 520. Virginia law does not allow that.

Brainchild separately argues CPA's assessment of the Country Charge and Funds Management Adjustment violated the implied covenant of good faith. But these arguments—that CPA charged more than pass-through costs and that the Country Charges related to companywide costs, not the costs required for renewals in particular jurisdictions—are the same ones Brainchild asserted in its express breach of contract arguments. As already discussed, the terms of the contract did not limit CPA to charging pass-through costs. And if the express terms contained no such limitation, Virginia law

18

prohibits using the implied covenant of good faith and fair dealing to re-write contractual provisions.

Next, we explained earlier that Brainchild has raised a genuine dispute of fact as to whether CPA properly assessed the Country Charge under the contract's terms. But even if CPA expressly breached the contract by improperly assessing the Country Charge, Brainchild has failed to raise a genuine dispute that CPA did so "in bad faith" or "dishonestly." *Wolf*, 512 F. App'x at 345; *Enomoto*, 624 F. Supp. 2d at 450. We see nothing in Virginia law that permits a claim for breach of the implied covenant of good faith and fair dealing that simply duplicates a claim for an express breach of the contract. Other jurisdictions prohibit such duplication. *See Concesionaria DHM, S.A. v. Int'l Fin. Corp.*, 307 F. Supp. 2d 553, 564 (S.D.N.Y. 2004) (explaining that under New York law, "courts routinely dismiss a claim for breach of an implied covenant of good faith" when duplicative of a claim for express breach of the contract). Because Brainchild fails to raise a genuine dispute as to CPA's bad faith and this argument duplicates its express breach of contract arguments, we agree with the district court that Brainchild cannot overcome summary judgment on this theory of breach.

### B.    Expert Witnesses

Because we reverse the grant of CPA's summary judgment motion and remand for further proceedings on Brainchild's theory that CPA improperly assessed Country Charges, we must address the district court's expert conclusions. Both Cass and Keogh offered opinions that involve that theory. Cass testified that the Country Charge was limited to required infrastructure, personnel and third-party expenses. He also disputed whether

19

CPA's Country Charges bore any relationship to required personnel, infrastructure or third parties in particular jurisdictions. And he opined that such costs could be quantified. Keogh testified that several jurisdictions where CPA renewed patents on Brainchild's behalf would have imposed no personnel or infrastructure costs captured by the Country Charge. He also opined on the type of expenses that could be included in the Country Charge.

Federal Rule of Evidence 702 grants the district court a critical gatekeeping role over expert testimony. *See Nease*, 848 F.3d at 230. Here, the district court exercised that gatekeeping authority to exclude David Cass' testimony for lacking expert qualification and improperly offering legal conclusions. The court disqualified John Keogh for offering confidential information about CPA and alternatively excluded his testimony for failing to disclose the bases for some opinions and improperly offering legal conclusions. We address each expert in turn, reviewing their exclusion for abuse of discretion. *See Westberry*, 178 F.3d at 261. If the court was "guided by erroneous legal principles" or rested its conclusion "upon a clearly erroneous factual finding," it has abused its discretion. *Id.*

### 1.  David Cass

We begin with legal conclusions. "[O]pinion testimony that states a legal standard or draws a legal conclusion by applying law to the facts is generally inadmissible." *United States v. McIver*, 470 F.3d 550, 562 (4th Cir. 2006). Experts—including lawyers—may opine on the "ordinary practices of those engaged in [a particular] business." *Adalman v. Baker, Watts & Co.*, 807 F.2d 359, 367 (4th Cir. 1986), *abrogated on other grounds by Pinter v. Dahl*, 486 U.S. 622 (1988). But they may not "constru[e] a document for its legal effect." *Id.* (quoting *Marx & Co. v. Diners' Club Inc.*, 550 F.2d 505, 512 (2d Cir. 1977)).

20

As the Second Circuit noted in *Marx*, there is already "a knowledgeable gentleman in a robe whose exclusive province it is to instruct the jury on the law." *Marx*, 550 F.2d at 512.[9]

The district court found Cass improperly offered legal conclusions in two ways: (1) by concluding CPA "overcharged" Brainchild, Cass applied law to fact and usurped the roles of the court and finder of fact; and (2) he opined on the meaning of the contract's Country Charge and Funds Management Adjustment provisions, which the court explained is a "quintessential legal question." J.A. 2567. Starting with the second point, in his reports, Cass offered his interpretations of the Country Charge and Funds Management Adjustment provisions. For example, he said, "the Country Charge is limited to *required* infrastructure, CPA Global personnel and third parties (agent fees)." J.A. 381. But in offering this opinion, Cass was effectively interpreting the agreement. Experts aren't permitted to do that. The "agreement speaks for itself, and its proper interpretation is a question of law. Thus, we find that the district court was correct in excluding expert testimony proferred [sic] by the plaintiff[] for the purpose of interpreting [the contract]." *Forrest Creek Assocs., Ltd. v. McLean Sav. & Loan Ass'n*, 831 F.2d 1238, 1242 (4th Cir. 1987); *see also Marx*, 550 F.2d at 509–10 (excluding expert opinion "as to the meaning of the contract terms at issue").

Cass also testified that upon reviewing CPA invoices, he found "overcharging is present with every non-US renewal payment." J.A. 259. Cass reviewed numerous invoices

---

[9] While this quote accurately portrays the law, it is a bit outdated. Fortunately, there are knowledgeable men *and* women in robes these days, which makes our judiciary all the better.

and conducted calculations to reach this conclusion. To be sure, there is nothing improper about Cass testifying about his calculations. Nor is there a problem with his use of the term "overcharged." That's because "overcharged" does not state a legal standard on its own. *See McIver*, 470 F.3d at 561–62. But Cass' opinion that CPA "overcharged" Brainchild depended on his interpretation of the Country Charge and Funds Management Adjustment provisions. In other words, Cass' only basis for saying the charges were excessive was his interpretation of what the Country Charge and Funds Management Adjustment provisions meant. As already discussed, the district court appropriately excluded his contract interpretation as an improper legal conclusion. When that contract interpretation falls away, so does his "overcharging" conclusion.

We have occasionally permitted testimony that comes close to stating a legal conclusion in complex and highly technical cases. *See United States v. Offill*, 666 F.3d 168, 175 (4th Cir. 2011); *see also United States v. Barile*, 286 F.3d 749, 760 n.7 (4th Cir. 2002) (noting expert testimony arguably stating a legal conclusion "may be helpful if the case involves a specialized industry such as insurance" (quoting *Weinstein's Federal Evidence* § 704.04[2][a] (2d ed. 2001)). And the patent renewal industry is a specialized industry. But Cass is testifying to *this* contract's meaning, rather than practices in the industry. The

district court acted within its discretion in excluding Cass' testimony to the extent it improperly offers legal conclusions.[10]

As to Cass' remaining opinions, the district court excluded them because it found Cass lacked sufficient knowledge and experience to opine on patent renewal services. Federal Rule of Evidence 702 requires expert witnesses to be "qualified as an expert by knowledge, skill, experience, training, or education." An expert "need not be precisely informed about all details of the issue[]," but he must have "satisfactory knowledge, skill, experience, training [or] education on the issue for which the opinion is proffered." *Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 799 (4th Cir. 1989). The district court found Cass lacked relevant knowledge or experience because he had never worked in the patent renewal field or even seen patent renewal contracts until this case. The court rejected Brainchild's argument that Cass had sufficient experience in international business and contracting to qualify as an expert.

Cass had experience managing financial and credit risk in the IT space. He maintained business registrations in foreign jurisdictions and entered contracts with country and funds management fees. Yet Cass also admitted he lacked expertise in patent

---

[10] Our analysis casts no doubt on the use of expert testimony to offer opinions about the ordinary or specialized meaning of a particular word or phrase. That is a matter of fact, not law. Patent law makes this clear. There, experts often testify to the meaning of a term of art "to a person of ordinary skill in the art at the time of the invention." *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 332 (2015). But "in the actual interpretation of the patent the court proceeds upon its own responsibility, as an arbiter of the law, giving to the patent its true and final character and force." *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 388 (1996) (quoting 2 W. Robinson, *Law of Patents* § 732, pp. 481–83 (1890)).

23

renewals. And he never reviewed a patent renewal contract until this case. On abuse-of-discretion review, we do not stand in the district court's shoes. Instead, we ask "whether the district court's conclusion was 'guided by erroneous legal principles . . . or rests upon a clearly erroneous factual finding.'" *Le Doux v. W. Express, Inc.*, 126 F.4th 978, 987 (4th Cir. 2025) (quoting *T.H.E. Ins. v. Davis*, 54 F.4th 805, 818 (4th Cir. 2022)). We see no misapplication of legal principles or clearly erroneous factual findings. The court did not abuse its discretion in excluding Cass' testimony for a lack of qualification.

### 2. John Keogh

Keogh, a "patent and trademark attorney," worked for CPA for nine years.[11] J.A. 304. He served in multiple roles, such as heading the "IP Legal" team that monitored the regulatory landscape in various jurisdictions. He had "comprehensive exposure to CPA's renewal practices." J.A. 536. After working with CPA, Keogh took on the CEO position at a CPA competitor named RenewalsDesk. In this case, Brainchild asked Keogh to opine on intellectual property renewals and "how CPA Global, RenewalsDesk, and other providers renew IP rights and charge clients." *Id.* At several points in his expert reports, Keogh referenced details of how RenewalsDesk charges clients. Keogh noted that RenewalsDesk, contrary to CPA, assesses an equivalent of a funds management fee at a flat 5%. He then

---

[11] A "patent and trademark attorney" is a non-lawyer who is authorized to draft and file patents in Australia and the United Kingdom. It is the equivalent of a "patent agent" in the United States.

24

analyzed CPA's renewal charges and found the supposed Funds Management Adjustment repeatedly exceeded that 5% threshold.

The district court first purported to exercise its inherent power to disqualify Keogh from testifying about confidential information derived from CPA. While we have never addressed this issue, the Fifth Circuit has held that federal courts "have the inherent power to disqualify experts, although cases that grant disqualification are rare." *Koch Refin. Co. v. Jennifer L. Boudreau M/V*, 85 F.3d 1178, 1181 (5th Cir. 1996) (citation omitted). This primarily happens if an expert who consults for one party switches sides to consult for the opposing party in the same litigation. In that situation, the expert "ha[s] received confidential information from the adverse party pursuant to the earlier retention." *Id.* (quoting *Wang Lab'ys, Inc. v. Toshiba Corp.*, 762 F. Supp. 1246, 1248 (E.D. Va. 1991)). Courts have used a two-part test to address this situation: (1) was it objectively reasonable for the first party who retained the expert to conclude a confidential relationship existed; and (2) was any confidential or privileged information disclosed by the first party to the expert? *Id.* If the answer to both questions is yes, the witness should be disqualified. *Id.* Confidential information includes the initial "retaining party's strategies in the litigation, the kinds of experts the party expected to retain, the party's views of the strengths and weaknesses of each side, the role of each of the party's witnesses to be hired, and anticipated defenses." *Id*. at 1182 (cleaned up).

Following this two-part approach, the district court concluded CPA reasonably perceived it had a confidential relationship with Keogh because of his prior employment at CPA. We assume, without deciding, that is correct. But Keogh never served as an expert

25

for CPA, let alone served as an expert for CPA in *this* litigation. So, while it may be true that CPA believes Keogh learned confidential or proprietary information about CPA while working there, it was not information gained from any role in the current litigation. And there is "a distinction between confidential business and financial records and confidential communications related to a particular litigation." *United States ex rel. Cherry Hill Convalescent, Ctr., Inc. v. Healthcare Rehab Sys., Inc.*, 994 F. Supp. 244, 251 (D.N.J. 1997). Only the latter type of information warrants disqualification under the Fifth Circuit's approach.

What's more, disqualifying a witness because he gained confidential, but not litigation-related, information while working for a company could have significant implications on evidence now widely accepted as admissible. Take, for example, False Claims Act litigation. Whistleblower information is often confidential. Could a witness be disqualified merely because he possessed and used confidential information to testify in a *qui tam* case?[12] Surely not.

---

[12] Two additional points. First, while possessing and using confidential business information is not enough on its own to trigger disqualification of a witness, disclosing information might implicate contractual non-disclosure obligations. The parties do not raise that issue, so we need not, and thus do not, address it here. Second, the type of supposed confidential information involved here seems factual in nature, not opinion testimony. Thus, we are not sure whether any questions about the ability of witnesses to use and/or disclose such information, at least in this case, apply any differently to expert witnesses than they would to fact witnesses. But again, no one raised this issue, so we do not decide it today.

26

Keogh left CPA in 2014, seven years before Brainchild filed suit. He may know confidential business information about CPA's pricing, but there is no evidence he "had communications with [CPA] about this particular lawsuit." *Cherry Hill*, 994 F. Supp. at 251. Keogh knew nothing about "strategies in the litigation" or CPA's "views of the strength and weaknesses of each side." *Koch Refining Co.*, 85 F.3d at 1182; *cf. Rhodes v. E.I. Du Pont De Nemours and Co.*, 558 F. Supp. 2d 660, 671 (S.D. W. Va. 2008) (disqualifying a side-switching expert who obtained "protected work product" information from the first retaining party). So, even under the Fifth Circuit's approach, the district court abused its discretion in concluding Keogh possessed confidential information warranting disqualification.

The district court alternatively excluded Keogh's testimony to the extent he failed to disclose the bases of his opinion and improperly offered legal conclusions. We find no abuse of discretion in those conclusions.

First, as to Keogh's failure to disclose the bases of his opinions, Federal Rule of Civil Procedure 26(a)(2)(B) addresses this very point. It requires an expert's written report to include "a complete statement of all opinions the witness will express and the basis and reasons for them," along with "the facts or data considered by the witness in forming them." Fed. R. Civ. P. 26(a)(2)(B)(i)–(ii). If a party fails to disclose this information, he is "not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

27

This is black letter law. It ensures parties have the information they need to assess an expert's opinions and to effectively cross-examine him. *See Fidelity Nat'l Title Ins. Co. of N.Y. v. Intercounty Nat'l Title Ins. Co.*, 412 F.3d 745, 751 (7th Cir. 2005). And without requiring disclosure of the bases for an expert's opinion, the expert might be effectively permitted to testify that his opinion is true simply "because I say so." *See Small v. WellDyne, Inc.*, 927 F.3d 169, 177 (4th Cir. 2019). For these reasons, district courts have routinely prevented an expert from hiding the bases for an opinion behind a shroud of confidentiality. *See, e.g.*, *In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 471–72 (S.D.N.Y. 2016) (barring doctor who worked on FDA approval of a product from testifying about that product unless she "disclose[d] the things 'considered,'" including "contents of conversations" she claimed were confidential); *In re Rail Freight Surcharge Antitrust Litig.*, MDL Dkt. No. 1869, 2013 WL 12384733, at *6 (D.D.C. Nov. 12, 2013) (prohibiting expert from testifying about negotiations unless he disclosed details about the negotiations despite confidentiality concerns).[13]

Keogh described—in his expert report—RenewalsDesk's 5% currency charge as "reasonable" to cover the costs CPA addresses with the Funds Management Adjustment. J.A. 299. He then pointed out that CPA's Funds Management Adjustment regularly

---

[13] None of this analysis is to discount the importance of protecting confidential information. But the Federal Rules of Civil Procedure provide tools to ensure such protections, including protective orders. *See* Fed. R. Civ. P. 26(c). If someone elects to serve as an expert witness, he must disclose all bases for his opinion, including any confidential information.

28

exceeded 5%, which he described as "overcharg[ing]." *Id.* In his rebuttal report, Keogh further compared services offered by RenewalsDesk and CPA. At a deposition, CPA peppered Keogh with questions about RenewalsDesk's operations and cost allocations. Keogh declined to divulge any confidential information about RenewalsDesk. Therefore, the district court acted within its discretion by excluding Keogh's testimony to the extent it is based on RenewalsDesk's confidential information.

Second, legal conclusions. Just like Cass, Keogh opined on the meaning of the contract's Country Charge and Funds Management Adjustment provisions. He described the Country Charge as "mainly cover[ing] what CPA Global needs to pay third parties on behalf of a client for a specific jurisdiction . . . . It would not include CPA Global's internal costs of maintaining infrastructure, hiring people, and having processes to make payments." J.A. 538. He described the Funds Management Adjustment as representing "the amount needed to cover associated [currency exchange] costs." J.A. 539. But again, the "agreement speaks for itself, and its proper interpretation is a question of law." *Forrest Creek*, 831 F.2d at 1242. Keogh's interpretation of the contract constitutes an improper legal conclusion. Keogh then reviewed Brainchild's invoices in light of his contractual interpretation, leading him to conclude "that Brainchild is being overcharged." J.A. 899. He only reached that conclusion, though, after interpreting the contract terms. The district court acted within its discretion in excluding Keogh's testimony to the extent it improperly offers legal conclusions.

## III.

To sum up our conclusions, we reverse the grant of summary judgment for CPA. We agree with the district court that Brainchild's pass-through cost and implied covenant of good faith theories of breach fail to overcome summary judgment. But we reverse summary judgment for CPA, and remand, on Brainchild's theory that CPA applied Country Charges unrelated to personnel, infrastructure and third parties required to renew in a particular jurisdiction. We affirm the denial of Brainchild's summary judgment motion.

As for the expert motions, we affirm the exclusion of David Cass' testimony on the grounds that he lacked proper qualification and that his opinions involved legal conclusions. We reverse the district court's decision to disqualify John Keogh due to his exposure to confidential CPA business information when he worked there. But we ultimately affirm the court's exclusion of his testimony to the extent that he refused to disclose the bases of his opinions and improperly offered legal conclusions.[14]

---

[14] Brainchild finally argues the district court should have granted it a second opportunity to amend its fraud complaint. "[L]eave to amend a pleading should be denied" in only certain circumstances, such as if "the amendment would be futile." *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 509 (4th Cir. 1986). "Futility is apparent if the proposed amended complaint fails to state a claim under the applicable rules and accompanying standards," such as Federal Rule of Civil Procedure 9(b)'s particularity standard. *Katyle v. Penn Nat. Gaming, Inc.*, 637 F.3d 462, 471 (4th Cir. 2011). We review a district court's denial of leave to amend for abuse of discretion. *See Garnett v. Remedi Seniorcare of Va., LLC*, 892 F.3d 140, 142 (4th Cir. 2018).

The district court directed Brainchild to allege, with particularity, "which material facts were concealed, who is responsible for the concealing, and the manner of concealment" in its first order. *Brainchild*, 2022 WL 992734, at *4. Upon reviewing the

*AFFIRMED IN PART, REVERSED IN PART*
*AND REMANDED*

---

amended complaint, the district court concluded Brainchild only alleged misrepresentation within the contract itself. *Brainchild*, 2023 WL 159769, at *4. Brainchild also failed to allege who was responsible, and how, despite the district court's earlier order to do so. *Id.* at *4–5. The court denied leave to amend as futile on these grounds. *Id.* at *6. We agree. All of Brainchild's allegations of misrepresentation are identical to its breach of contract claim. *See Lissmann v. Hartford Fire Ins. Co.*, 848 F.2d 50, 53 (4th Cir. 1988) (distinguishing between a fraudulent statement and breach of a contract). And Brainchild already failed to resolve pleading defects after the district court provided an opportunity to do so. *See Iron Workers Loc. 16 Pension Fund v. Hilb Rogal & Hobbs Co.*, 432 F. Supp. 2d 571, 595 (E.D. Va. 2006) (noting the Eastern District of Virginia often considers a claim futile after plaintiff has had two opportunities to plead it). For these reasons, the district court acted within its discretion when denying Brainchild leave to amend its fraud claim a second time.

31